690 F.2d 616
 Dorothy GAUTREAUX, et al., Plaintiffs-Appellees,
v.
Samuel R. PIERCE, Secretary of the Department of Housing and
Urban Development, et al., Defendants-Appellees,
v.
ROGERS PARK COMMUNITY COUNCIL, et al., Proposed
Intervenors-Appellants.
Dorothy GAUTREAUX, et al., Plaintiffs,
v.
Moon LANDRIEU, Secretary of the Department of Housing and
Urban Development, et al., Defendants,
Appeal of Ginger MACK, Class Member.
Dorothy GAUTREAUX, et al., Plaintiffs-Appellees,
v.
ILLINOIS HOUSING DEVELOPMENT AUTHORITY, Defendant-Appellant.
 Nos. 81-2308, 81-2311 and 81-2361.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 10, 1982.
Decided Sept. 30, 1982.
 
 Stephen B. Diamond, Chicago, Ill., for appellant.
 Jeffery Jahns, Seyfarth, Shaw, Fairweather, Geraldson, Chicago, Ill., for defendant-appellant.
 Lawrence Jay Weiner, Fredric Bryan Lesser, Lawrence Jay Weiner & Assoc., Chicago, Ill., for intervenor.
 Gershon M. Ratner, Associate Gen. Counsel for Litigation, Dept. of Housing & Urban Development, Washington, D.C., for defendants-appellees.
 Alexander Polikoff, Business and Professional People for Public Interest, Chicago, Ill., for plaintiff-appellee.
 Before CUMMINGS, Chief Judge, DAVIS, Associate Judge,* and PELL, Circuit Judge.
 PELL, Circuit Judge.
 
 
 1
 This appeal arises from two consolidated actions in the district court, Nos. 66-C-1459 and 66-C-1460, brought by the plaintiffs against the Chicago Housing Authority (CHA) and the Department of Housing and Urban Development (HUD) respectively. The plaintiffs, approximately 43,000 black tenants of and applicants for public housing, brought these suits alleging that CHA in conjunction with HUD had violated various statutory rights and their constitutional rights under the Fifth and Fourteenth Amendments by selecting housing project sites in predominantly black neighborhoods and by using racial quotas to limit the number of blacks in housing projects in predominantly white neighborhoods. Both CHA and HUD were found to have been guilty of the alleged discriminatory practices at a relatively early stage in the course of this litigation. Over ten years of litigation followed the entry of the decree of liability against CHA in 1969. The task presently before this court is to review the validity of a consent decree, negotiated between the plaintiffs and HUD and approved by the district court, which purports to provide a workable remedy for HUD's discriminatory practices. Two parties are appealing from the district court's approval of the consent decree. The Illinois Housing and Development Authority (IHDA), one of the defendants, is claiming in essence that the provisions of the decree are beyond the parameters of HUD's authority and were approved without the procedural prerequisites to the entry of a consent decree. Ginger Mack (Mack), a member of the plaintiff class, alleges that the decree fails to remedy the discrimination and challenges the designation of "Revitalizing" areas, specifically that of the Hyde Park-Kenwood area, in which assisted housing may be placed under the decree. In addition, the proposed intervenor-appellant Rogers Park Community Council (RPCC) is appealing the district court's denial of its motion to intervene, and is seeking to have revised the decree's designation of a portion of the Rogers Park neighborhood as a "Revitalizing" area.
 
 I. Relevant Background of the Proceedings
 A. The Determination of Relief
 
 2
 In 1966, the plaintiffs against CHA in Gautreaux v. Chicago Housing Authority, No. 66-C-1459 (N.D.Ill.1966), brought a companion suit against HUD, Gautreaux v. Romney, No. 66-C-1460 (N.D.Ill.1966), claiming that HUD had sanctioned and assisted CHA's racially discriminatory housing practices. The complaint sought a declaratory judgment against HUD, an injunction to prohibit HUD from making any federal funds available to CHA which would support or further the racially discriminatory practices, and "such other and further relief as the Court may deem just and equitable." The district court dismissed the complaint against HUD primarily for failure to state a claim. On appeal in 1971, this court reversed and granted summary judgment against HUD on two counts of the complaint, finding that HUD had knowingly acquiesced in CHA's discriminatory practices. The case was remanded to the district court for appropriate relief. Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971). The district court granted the plaintiffs the declaratory and injunctive relief sought against HUD, and grappled with the amorphous concept of "just and equitable" relief. The district court ordered HUD to use its "best efforts" to increase the supply of dwelling units in conformity with the relevant federal statutes, rules, and regulations and with the provisions of a 1969 Judgment Order entered against CHA in the companion case. See Gautreaux v. CHA, 304 F.Supp. 736 (N.D. Ill. 1969). The district court refused to order relief beyond the legal boundaries of the city of Chicago because it found the discriminatory practices to have been committed within those boundaries. Gautreaux v. Romney, 363 F.Supp. 690 (N.D. Ill. 1973). Shortly afterwards, the case against HUD was consolidated with that against CHA.
 
 
 3
 The 1969 Judgment Order against CHA contained a comprehensive plan designed to remedy the effects of and prevent continuation of the discriminatory practices by enjoining further construction of public housing in predominantly non-white areas without simultaneous construction in predominantly white areas. The 1969 Judgment Order mandated that CHA: (1) use its "best efforts" to increase the supply of family public housing units as rapidly as possible; (2) not commence construction of any family public housing units without first beginning construction of 700 units in the "General Public Housing Area" of Chicago (defined as census tracts which are both (a) 70% or more white as determined by the United States Bureau of the Census, and (b) not within one mile of a census tract 30% or more non-white (the criterion for the "Limited Public Housing Area") as determined by the United States Bureau of the Census; (3) locate 75% of all future family public housing units beyond the 700 units in the General Public Housing Area; (4) cease and desist discrimination on the basis of race; and (5) limit the size of new public housing projects and their concentration with other CHA projects. Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736 (N.D. Ill. 1969).
 
 
 4
 Numerous appeals followed from the district court's determination of the relief to be accorded against CHA and HUD.[1] Of these appeals, only those concerning the appropriateness of remedial efforts outside the city of Chicago have a significant bearing on the present appeals. This court reversed the previously discussed district court decision in Gautreaux v. Romney, 363 F.Supp. 690 (N.D. Ill. 1973), in which the district court had refused to order metropolitan area relief, that is, relief beyond the legal boundaries of the city of Chicago. This court concluded that metropolitan area relief was not precluded simply because the wrongs had been committed within Chicago and against Chicago residents, and remanded the case to the district court for "the adoption of a comprehensive metropolitan area plan that will not only disestablish the segregated public housing system in the City of Chicago ... but will increase the supply of dwelling units as rapidly as possible." Gautreaux v. Chicago Housing Authority, 503 F.2d 930, 939 (7th Cir. 1974).
 
 
 5
 This court's decision was appealed to the Supreme Court on the permissibility of "inter-district relief for discrimination in public housing in the absence of a finding of an inter-district violation." Hills v. Gautreaux, 425 U.S. 284, 292, 96 S.Ct. 1538, 1543, 47 L.Ed.2d 792 (1976). The Supreme Court concluded metropolitan area[2] relief was not precluded by virtue of the constitutional and statutory violations having been committed in Chicago. Id. at 300, 96 S.Ct. at 1547. The more substantial question, according to the Court, was whether an order against HUD affecting its conduct beyond Chicago's boundaries would impermissibly interfere with local governments and suburban housing authorities that had not been implicated in HUD's unconstitutional conduct. It reasoned that an order directed solely to HUD would not force unwilling localities to apply for assistance but would merely reinforce the regulations guiding HUD's determination of which of the locally authorized projects to assist with federal funds. Id. at 303, 96 S.Ct. at 1549. The Court concluded:
 
 
 6
 In sum, there is no basis for the petitioner's claim that court-ordered metropolitan area relief in this case would be impermissible as a matter of law under the Milliken (v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1971) ) decision. In contrast to the desegregation order in that case, a metropolitan area relief order directed to HUD would not consolidate or in any way restructure local governmental units. The remedial decree would neither force suburban governments to submit public housing proposals to HUD nor displace the rights and powers accorded local government entities under federal or state housing statutes or existing land-use laws. The order would have the same effect on the suburban governments as a discretionary decision by HUD to use the statutory powers to provide the respondents with alternatives to the racially segregated Chicago public housing system created by CHA and HUD.
 
 
 7
 Id. at 305-06, 96 S.Ct. at 1550. The Supreme Court affirmed the decision of this court. It remanded the case to the district court for further evidence and consideration on the issue of metropolitan area relief so that the district court could determine the nature and scope of relief "in the exercise of its equitable discretion." Id. at 306, 96 S.Ct. at 1550.
 
 B. The Consent Decree
 1. The Proceedings
 
 8
 On February 25, 1975, prior to the Supreme Court's decision, fourteen additional defendants, including IHDA, were added by the plaintiffs by way of a second supplemental complaint. After the Supreme Court's remand, HUD and the plaintiffs voluntarily entered into a Letter of Understanding dated June 7, 1976, later modified and extended in a second Letter of Agreement dated July 29, 1977, in which the parties agreed to implement metropolitan area relief in a demonstration program. The demonstration program continued in operation for several years after agreement to an additional extension. On November 24, 1980, the plaintiffs and HUD told the district court that they would soon have a draft settlement agreement between them, and the court set a December 18, 1980 date for a preliminary hearing on the soon-to-be-proposed consent decree.[3] A copy of the draft consent decree was received by IHDA on December 2, without exhibits. On the following day, an explanation of the decree by counsel for the plaintiffs and HUD was given to IHDA and others.
 
 
 9
 At the December 18 hearing, the district court determined that the proposed decree with exhibits was "within the range of possible approval." The court set a fairness hearing date of January 14, 1981 and approved the form of notice to be sent to the class members. This notice was mailed and published on December 25, 1980, informing class members of the nature of the proposal, its availability for examination at the office of the clerk of the district court, and that public meetings would be held on January 6, 8 and 9, 1981.
 
 
 10
 On January 2, 1981, IHDA filed a cross-claim seeking injunctive relief against implementation of the proposed decree alleging that the decree's requirements upon HUD went beyond the parameters of HUD's authority and restrictions imposed on HUD by its governing regulations. On January 5, IHDA filed a discovery motion for documentation of the decree's negotiations and a motion to be permitted to appear sometime after January 14 to present its objections to the decree. The court continued IHDA's discovery motion and gave IHDA until January 19 to present its objections. On January 13, IHDA presented further discovery requests. The court granted four of IHDA's six deposition requests, and continued a documentary request.
 
 
 11
 On January 14, the first day of the fairness hearing, the court heard from the proponents of the decree. The hearing resumed on January 19, at which time the court granted a joint motion to amend the decree by its proponents, and denied IHDA's motion for a preliminary injunction, its continued documentary request, and its renewed motion for a previously denied deposition. Objections to the proposed consent decree were presented, including requests for a continuance. At the beginning of its presentation, IHDA moved for judgment arguing that the proponents of the decree had failed to meet their burdens of persuasion and of going forward with evidence. The court took no action on the motion. Upon conclusion of the objectors' evidence, the proponents presented additional evidence in support of the decree. Closing arguments were set for February 6, 1981, and later rescheduled for February 27, 1981. On June 16, 1981, the district court issued its Memorandum Opinion and Order approving the consent decree. The decree was amended sua sponte on June 25 and entered as a final order on June 30, 1981. An order changing a provision of the decree was entered on July 23, 1981.
 
 2. The Terms of the Consent Decree
 
 12
 The decree and its exhibits A and B are appended to the district court's decision approving the consent decree. 523 F.Supp. at 672-83. Exhibits C and D are, respectively, an amendment to the contract between HUD and the Leadership Council for Metropolitan Open Communities (LCMOC) and a Model Program proposal for funds for substantial rehabilitation of housing. Their extensive provisions need not be appended to this opinion for purposes of our review.
 
 
 13
 Only the more fundamental provisions of the decree and exhibits, given their length and complexity, will be examined in detail. The consent decree applies to the plaintiffs and HUD, "including their agents, employees, successors and assigns, and to all other persons in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise." The introductory paragraph of the decree provides that the motion of 1979 pursuant to which metropolitan relief was sought is to be withdrawn as of the effective date of the decree, the date upon which the decree is entered by the district court.
 
 
 14
 Most provisions of the decree apply to "assisted housing," which is defined as non-elderly housing subsidized by HUD directly or through a public housing agency, under the following housing programs or under any housing program in the future for the benefit of poor persons as an addition to or alternative or substitute for the following programs:
 
 
 15
 (1) Pursuant to section 8 of the United States Housing Act of 1937, as amended, the following "Section 8" programs:
 
 
 16
 (a) New Construction (24 C.F.R. Part 880);
 
 
 17
 (b) Substantial Rehabilitation (24 C.F.R. Part 881);
 
 
 18
 (c) Existing Housing (24 C.F.R. Part 882, subparts A and B);
 
 
 19
 (d) Moderate Rehabilitation (24 C.F.R. Part 882, subparts D and E);
 
 
 20
 (e) State Housing Agencies (24 C.F.R. Part 883);
 
 
 21
 (f) Special Allocations (known as Loan Management and Property Disposition) (24 C.F.R. Part 886);(2) Public Housing New Construction and Acquisition (24 C.F.R. Part 841); and
 
 
 22
 (3) Rent Supplement (24 C.F.R. Part 215) and Rental Assistance Payments Program (24 C.F.R. Part 236, subpart D) only to the extent that the projects in question had not received any payments pursuant to these two programs before the effective date of the consent decree.
 
 
 23
 Unlike the 1969 Judgment Order in which Cook County was divided into a Limited Area and a General Area, the decree provides for metropolitan relief by dividing the six counties comprising the Chicago Standard Metropolitan Statistical Area into a General Area, a Limited Area, and a Revitalizing Area. The General Area consists of those parts of the city of Chicago which lie within the census tracts listed in Exhibit A to the decree and all of the tracts within the Chicago SMSA outside of the city except those listed in Exhibit A as excluded from the General Area. The district court characterized the General Area, defined as including "predominantly non-minority" areas, as having less than 30% minority population. The Limited Area, defined as including "predominantly minority" areas and characterized by the district court as having more than 30% minority population, is that part of the city of Chicago within the census tracts not listed in Exhibits A or B and those parts of the Chicago SMSA outside of the city listed in Exhibit A as excluded from the General Area. The Revitalizing Area, defined as generally being areas of the city of Chicago having substantial minority occupancy and undergoing substantial physical development, encompasses that part of the city of Chicago which lies within the census tracts listed in Exhibit B.[4]
 
 
 24
 Essentially, HUD's obligations under the decree do not expire until 7,100 eligible persons[5] have commenced occupancy of assisted housing units in the General Area and Revitalizing Area. The LCMOC is to continue to be employed as HUD's agent to assist eligible persons in obtaining assisted housing, as it was pursuant to the Letters of Understanding. Each year in addition to the "fair share" of Section 8 units annually allocated to the Chicago SMSA pursuant to 24 C.F.R. § 891, subpart D (1981), HUD must set aside additional funding authority for:
 
 
 25
 (1) 150 units of Section 8 Existing Housing Units;
 
 
 26
 (2) 250 Section 8 New Construction and/or Substantial Rehabilitation units to be located in the General Area or in the Revitalizing Area with mortgages insured under the National Housing Act, with the units to be in projects that contain no more than approximately 30 units or in projects whose sponsors agree to enter into Housing.
 
 
 27
 Assistance Payments contracts for 20%-35% of the units in each project; and
 
 
 28
 (3) 100 units with the same criteria in (2) above, except that the units need not be in insured projects but are to be in projects "that will increase housing choice for large minority families" and are "accessible to public transportation."HUD is also to make available at least $3,000,000 in reallocated Community Development Block Grant funds for use in the Chicago SMSA and is to use its best efforts to assure that such funds are used to aid in providing assisted housing outside the Limited Area for eligible persons living in the Limited Area in the city of Chicago.
 
 
 29
 The decree also contains certain limitations and/or requirements for HUD's approval and authorization of assisted housing in the Chicago SMSA. HUD must require that in each assisted housing project 6% to 12% of the total number of housing units be held vacant for 30 to 60 days to be made available first to eligible persons. However, no more than 50% of the assisted housing units in the project may be reserved. In selecting the units to be reserved, at least 50% of the four or more bedroom units in the project and 50% of the three bedroom units must be reserved. These requirements apply to all assisted housing except public housing provided by CHA, Section 8 Existing Housing other than Moderate Rehabilitation, and projects receiving Rent Supplement or Rental Assistance Payments on or before the effective date of the decree.
 
 
 30
 In each New Construction or Public Housing New Construction and Acquisition project having five or more assisted housing units, not fewer than 10% of all assisted housing units must have three or more bedrooms. Within the General Area and Revitalizing Area of the Chicago SMSA, HUD may not approve any New Construction project containing more than approximately 100 assisted housing units or permit children to live above the third story, excluding structures having assisted housing units that constitute not more than approximately 35% of the total number of units in the structure. New Construction in the General Area and Revitalizing Area of the Chicago SMSA shall not be located in any census tract if, following such location, the aggregate number of apartments and single-family residences theretofore made available under any assisted housing program in such census tract would constitute more than 15% of the total number of apartments and single-family residences in such census tract.
 
 
 31
 Perhaps the most critical requirements of the decree are the locational requirements for New Construction and Existing Housing (other than Moderate Rehabilitation) units. HUD may not permit more than one-third of these Existing Housing Units and not more than one-third of these New Construction units, calculated separately, within the city of Chicago to be located in the Limited Area. HUD may not permit less than one-third of such housing, calculated separately, to be located in the General Area.
 
 
 32
 Under the decree, jurisdiction is retained by the district court. At any time five years after its effective date, either HUD or the plaintiffs, without the consent of the other, may ask the court to review progress under the decree and accordingly modify the decree. Not more frequently than every two years after the availability of final 1980 census data, either HUD or plaintiffs' counsel, without the consent of the other, may request the court to modify Exhibits A and B to the decree. In the event that compliance by HUD is rendered impossible by funding cuts or statutory modification, the decree is subject to revision by agreement of the parties and court approval to provide alternative relief comparable to that specified in the decree and consistent with HUD's revised funding or statutory authority. In the absence of agreement, alternative relief is to be submitted for adjudication by the court. Exemptions from certain quotas and requirements may be sought by HUD under certain conditions by petitioning the court for waiver of the relevant provision.
 
 C. Statutory and Regulatory Framework
 
 33
 HUD's so-called "Section 8 programs" arise out of Section 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974. 42 U.S.C. § 1437f (1976 & Supp. IV 1980). The Section 8 programs included in the definition of assisted housing in the consent decree are the programs for (a) New Construction; (b) Substantial Rehabilitation; (c) Existing Housing; (d) Moderate Rehabilitation; (e) State Housing Agencies; and (f) Special Allocations known as Loan Management and Property Disposition.[6] Generally Section 8 provides for federal rent subsidies for tenants of low and moderate income qualifying under the applicable regulations. See 24 C.F.R. Parts 888 and 889 (1981).
 
 
 34
 There are three general methods for payment for these subsidies. Under the certificate program for Existing Housing, a family is certified for rent subsidies and payments are made to the owner of any qualifying building in which the certified family is a tenant. See 24 C.F.R. Part 882 (1981). Similarly, under the Moderate Rehabilitation, Substantial Rehabilitation, and New Construction programs, HUD makes payments pursuant to a contract between HUD and the owner of a housing development for a specified percentage of units. See 24 C.F.R. Parts 880, 881, and 882, subparts D and E (1981).
 
 
 35
 The Section 8 programs for State Housing Agencies and for Loan Management and Property Disposition involve special set-asides of funds and differ from the other Section 8 programs in their method of disbursing payments. Disbursement under the Loan Management and Property Disposition program is a combination of the disbursement methods described above. See 24 C.F.R. Part 886 (1981). The disbursement method under the State Housing Agencies program merits more detailed explanation inasmuch as it is the program under which IHDA receives its funds. Part 883 of 24 C.F.R. "establishes the procedures for allocating set-asides of contract authority to State agencies and sets the policies and procedures under which they must use this authority to provide assistance in newly constructed, substantially rehabilitated, moderately rehabilitated, and existing housing." 24 C.F.R. § 883.101(a)(3) (1981). Ordinarily, from this lump sum Congressional authorization for Section 8 programs, HUD establishes separate funding authority for each of the Section 8 programs, including a set-aside for State Housing Agencies. HUD then allocates to area HUD offices their "fair share" allocation of each in proportion to the area's population, poverty, overcrowding, housing condition, and similar indices of housing needs. Each HUD area office suballocates the funds among the various allocation areas within its jurisdiction on essentially the same "fair share" basis, which may include a separate set-aside for a State Housing Agency. 24 C.F.R. § 883.101(g) (1981). The HUD area office and the State Housing Agencies divide responsibilities for processing applications for Section 8 funding.[7] For a project which it has processed, the State Housing Agency pays rental subsidies out of its own HUD funds to the project owner. 24 C.F.R. § 883.101(b) (1981). The State Housing Agencies and not HUD are responsible for arranging for the financing of any Newly Constructed or Substantially Rehabilitated Housing which is assisted under the Housing Agency program. 24 C.F.R. § 883.101(e) (1981). If any proposed project under the Section 8 program does not proceed within the prescribed time period, those funds reserved for the project are recaptured by HUD and are subject to reallocation. 24 C.F.R. § 891.405 (1981).
 
 II. The Appeal of IHDA
 
 36
 IHDA is the only State Housing Agency in Illinois. Its primary function is to sell tax-exempt debt instruments, that is, revenue bonds, to the public and to use the proceeds from the bonds to make first mortgage loans to non-profit or limited profit entities for the construction and substantial rehabilitation of multi-family housing developments throughout the state. IHDA's objections to the decree may be generally characterized as follows: (1) the consent decree violates HUD's regulations, the National Housing Act, and the dictates of the Supreme Court's decision in Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); (2) the decree was entered without the necessary procedural requisites; and (3) the consent decree is unreasonable.[8]
 
 
 37
 A. The Consent Decree In Relation to HUD's Regulations, Statutory Authority, and the Supreme Court's Decision in Hills v. Gautreaux
 
 
 38
 Generally, IHDA's claim that the consent decree violates the statutes and regulations governing HUD is predicated on what IHDA perceives to be the only restrictions on assisted housing which HUD may impose under the statutes and regulations and the additional restrictions which HUD may impose under the consent decree. For example, IHDA asserts that the only factors which HUD may consider in determining the annual set-aside for a State Housing Agency and the specifications for developments are contained in the regulations, and therefore that the consent decree violates the regulatory scheme by imposing additional criteria for approval and set-asides. IHDA also claims that Section 5.5.4.c. of the decree, limiting a project sponsor's withdrawal of a unit occupied by an eligible person, violates the regulations because the regulations do not contain any such limitation on withdrawal.[9]
 
 
 39
 Before a class action settlement may be rejected on the grounds that the settlement either initiates or authorizes the continuation of clearly illegal conduct, any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement. Armstrong v. Board of School Directors, 616 F.2d 305, 319-20 (7th Cir. 1980). IHDA's general protestations that the consent decree imposes prerequisites to action by HUD and project sponsors, which the statute and regulatory scheme do not, fails on its face to demonstrate the type of clear violation of the regulations necessary to reject the consent decree. Simply because the statute and regulations do not contain the limitations set forth in the consent decree, that does not signify that they prohibit the limitations on the consent decree thereby rendering the limitations illegal. HUD's discretion to award funds is not so limited as to the criteria it may consider that the requirements of the consent decree may be said to violate the regulations by imposing additional criteria.
 
 
 40
 As the district court noted, the consent decree does not violate the regulatory scheme "because the regulations gave HUD express discretion with respect to application for its funds." 523 F.Supp. at 671. The National Housing Act provides that the Secretary of HUD may reserve such housing assistance funds as he deems appropriate for use by a state or agency thereof. 42 U.S.C. § 1439(d)(3) (1976). Under the corresponding regulations for state housing agencies in 24 C.F.R. Part 883 (1981), as HUD notes, HUD retains broad discretion in setting the terms of set-asides for state housing agencies. Significantly, the regulations specify that if HUD decides to set aside funds for a state agency, the agency must submit a letter "agreeing to the terms of the set-aside," 24 C.F.R. § 883.204(b) (1981). " Moreover, under 24 C.F.R. § 883.312(a) (1981), the participation of a state agency in the Section 8 program is contingent upon its compliance "with Title VI of the Civil Rights Act of 1964 ... and all related rules, regulations, and requirements." Inasmuch as the consent decree is designed to bring HUD into compliance with Title VI based upon an adjudication that its practices had violated Title VI, its terms under this regulation are a related requirement with which IHDA must comply. Finally, HUD has the power to waive "any provision" of the regulatory scheme for good cause, subject to statutory limitations, 24 C.F.R. § 899.101(a) (1981).[10]
 
 
 41
 Specifically, IHDA asserts that the 6%-12% reservation requirement conflicts with: (1) section 1437f(e)(2) of 42 U.S.C. which requires that "tenant selection criteria" by a project owner of newly constructed or substantially rehabilitated units "give preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance under the section"; and (2) section 883.702(a)(3) of 24 C.F.R. which requires that before an owner markets to any other class of prospective tenants he must market to families expected to reside in the community because of current or planned employment there and families who are in the category of "least likely to apply" as determined in the Affirmative Fair Housing Marketing Plan. Section 883.702(a)(3) merely imposes advance marketing obligations and not any obligation to provide units to the designated families, and therefore could not conflict with the 6%-12% reservation requirement. Moreover, to make the necessary showing of clearly illegal conduct to invalidate the consent decree, it is not sufficient to allege merely, as IHDA does, that it is possible that a project in the future might not have sufficient units to accommodate both the decree's 6%-12% reserved unit requirement and the families to be accorded preference under 42 U.S.C. § 1437f(e)(2) and 24 C.F.R. § 883.702(a). This possibility is not only conjectural but remote given the relatively limited 6%-12% restriction and the fact that IHDA does not claim to have been so hampered by a somewhat different yet substantially similar reservation of 4% under the Letters of Understanding. In the remote event of any actual conflict, moreover, the regulatory requirement may be waived by the Secretary for good cause subject to any statutory limitations, 24 C.F.R. § 899.101(a) (1981), or, alternatively, HUD may seek a waiver of the consent decree requirement pursuant to the provisions for such waiver under the decree. For the statutory requirement, waiver under the consent decree of the 6%-12% requirement could also be sought by HUD, in both instances after consultation with IHDA pursuant to the consent decree. See Exhibit C to the Consent Decree at paragraph 11. In any event, the decree provides for subordination of the 6%-12% requirement to the statutory preference for displaced persons, see Exhibit C, and the other statutory preference for occupants of substandard housing in all likelihood will often coincide with those persons eligible for the 6%-12% reservation.
 
 
 42
 For these reasons, the cases of United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973); and Lower Moreland Homeowner's Association v. HUD, 479 F.Supp. 886 (E.D. Pa. 1979), upon which IHDA relies, fail to support IHDA's position on this point.[11] In each of these cases, a clear failure to comply with a valid regulation was established. In Lower Moreland, HUD had disavowed any claim that its actions had been in conformity with the applicable statute and regulations. 479 F.Supp. at 897-98. In United States v. Nixon, the Supreme Court found a justiciable controversy to be presented by President Nixon's refusal to turn over evidence based on assertions of executive privilege when a regulation had vested plenary authority to contest the invocation of executive privilege. 418 U.S. at 695-96, 94 S.Ct. at 3100-01. Unlike the present case, the discretion that President Nixon sought to assert had been delegated in its entirety to the Special Prosecutor pursuant to a valid, enforceable regulation. IHDA is correct in asserting that these cases establish that an agency or executive must honor binding regulations but IHDA has failed to show that anything in the consent decree clearly would compel HUD to act in abrogation of any statutory provision or regulation.
 
 
 43
 Similarly, IHDA urges Otero as authority for the proposition that the burden was on HUD in the fairness hearing to show that adherence to its regulations would frustrate its obligations under Title VI. However, IHDA fails to acknowledge that the Otero court's imposition of the burden on the agency presupposes a conflict between the agency's attempted action and its governing regulations. In such circumstances when the agency is attempting to justify its action,
 
 
 44
 (t)he burden should properly be upon the (agency) to show that its adherence to the regulation would in all likelihood result in a violation of its duties under the Constitution and the Fair Housing Act.
 
 
 45
 484 F.2d at 1135. Thus, the district court's statement that "IHDA has failed to show that under the proposed decree HUD would be violating the mandates of ... Otero," 523 F.Supp. at 670, is correct in that IHDA failed to demonstrate a clear statutory or regulatory violation as a predicate to the applicability of Otero 's burden.
 
 
 46
 Nor does the consent decree run afoul of the Supreme Court's decision in Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). IHDA contends that: (1) the Supreme Court found that metropolitan relief as in the consent decree was not warranted; (2) the decree impermissibly preempts the rights and powers of local government entities; and (3) the Supreme Court's decision mandated that a fact-finding hearing be held on the issue of the appropriateness of metropolitan relief before entry of such relief. Yet, as explained above, the Supreme Court concluded that metropolitan relief was not impermissible, and that "(a)n order directed solely to HUD would not force unwilling localities to apply for assistance but would merely reinforce the regulations guiding HUD's determination of which locally authorized projects to assist with federal funds." Id. at 303, 96 S.Ct. at 1549.[12] Accordingly, the district court correctly concluded:(S)ince IHDA is not legally bound to participate in the Section 8 program if it does not want to comply with HUD requirements it is difficult to see how HUD is infringing upon local governmental authorities.... HUD is not preempting IHDA's authority by exercising its discretion to award funds to authorities which comply with imposed restrictions designed to provide Gautreaux relief or violating its own regulations because the regulations give HUD express discretion with respect to application for its funds.
 
 
 47
 523 F.Supp. at 670-71.
 
 
 48
 The Supreme Court remanded the case to the district court with "(t)he nature and scope of the remedial decree to be entered on remand (as) ... a matter for the district court in the exercise of its equitable discretion, after affording the parties an opportunity to present their views." 425 U.S. at 306, 96 S.Ct. at 1550. The district court did not err in approving a metropolitan area remedy based on the evidence in the record and the reasonableness of defining the relevant housing market by the SMSA. See id. at 299-300, 96 S.Ct. at 1547. IHDA has failed to rebut the appropriateness of the metropolitan remedy other than to assert that the Supreme Court's decision prohibited such relief or that the proponents failed to carry their burden of demonstrating its appropriateness.
 
 
 49
 Nor did the Supreme Court's instructions on remand establish a procedural requisite for a fact-finding hearing before entry of such relief pursuant to the consent decree. The Court's directions signify nothing more than the established procedure for resolution of a disputed issue to be resolved on remand in light of the Court's determination. The controlling procedures for entry of a consent decree in the Manual for Complex Litigation § 1.46 (West 1982) and this court's opinion in Armstrong v. Board of School Directors, 616 F.2d 305 (7th Cir. 1980), necessitate no such hearing, and, indeed, such a requirement would undermine the underlying purposes of simplicity and expeditiousness served by consent decrees.[13]
 
 B. The Procedures in Entering the Decree
 
 50
 IHDA's second set of objections to the decree allege procedural errors in the entry of the decree by the district court. IHDA claims that the district court: (1) failed to impose and apply properly the burdens of proof and of going forward on HUD and the proponents of the decree; (2) failed to give the co-defendants an opportunity to participate in the negotiations between HUD and the plaintiffs; (3) improperly denied IHDA the right to conduct discovery; (4) failed to give adequate and proper notice to class members; and (5) improperly approved the decree because it failed to resolve finally the remedial issues in the case.
 
 
 51
 (1) The Conduct of the Negotiations
 
 
 52
 IHDA claims that the plaintiffs and HUD improperly excluded IHDA from participation in the consent decree negotiations, which, under this court's decision in In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106 (7th Cir. 1979), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95, would preclude district court approval of the decree. The allegations of exclusion are essentially predicated on IHDA's having received the first draft of the decree one day before it was to be explained by the proponents, its finalization on December 15, the time within which the fairness hearing was conducted, and the proponent's denials of discovery requests.
 
 
 53
 A comparison of these objections to the exclusionary negotiation method which was employed in General Motors makes it clear that any haste in negotiating and evaluating the consent decree was not such as to preclude IHDA from participation in the negotiations. In General Motors, the Illinois Attorney General had violated a pretrial order which prohibited him from entering into settlement negotiations without the consent of all plaintiffs' attorneys. In addition, the settlement contemplated the abandonment of prosecution of other class members' claims and contained a vague estimate of attorneys' fees and expenses. 594 F.2d at 1128-30. To compound the problem, the judge in General Motors had prohibited discovery of the settlement negotiations and severely limited questioning about the negotiations in the fairness hearing. Id. at 1131. The district court in this case emphasized in its opinion the difference in circumstances between the Gautreaux negotiations and those in General Motors, and the characterization of the Gautreaux negotiations is a straightforward and accurate evaluation of the negotiations that led to the decree:
 
 
 54
 In contrast, at no time has this court intimated that the manner or methods of negotiations are irrelevant to an evaluation of the decree. Additionally, there is no evidence that the negotiations which led to the proposed decree have been irregular, nor has there been an aura of secrecy surrounding the negotiations. The settlement negotiations were announced and the proponents agreed to consult with interested parties before submitting the decree for court approval.[14] The proponents also explained that the haste with which the decree was negotiated was due to the impending change in HUD's national administration and a desire to complete negotiations and the fairness hearing while the HUD counsel most intimately familiar with the case would still be able to participate. There has been no impropriety.
 
 
 55
 523 F.Supp. at 670. IDHA was afforded a meaningful opportunity to participate in the negotiations of the consent decree despite the time constraints, and had a full opportunity to present its objections to the conduct of the negotiations in the fairness hearing. The conduct of the negotiations was not exclusionary under General Motors and, therefore, does not warrant reversal of the court's approval of the decree.
 
 
 56
 (2) The Burdens of Proof and of Going Forward
 
 
 57
 IHDA's argument that the district court failed to impose the appropriate burden of proof and of going forward on the proponents of the decree is again premised on unwarranted application of this court's decision in In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106 (7th Cir. 1979), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95. IHDA asserts that the district court's acceptance of the settlement as fair on its face, forcing the objectors to prove its inadequacy as was done in General Motors, necessitates reversal. Initially, we note that the grounds for reversal in General Motors were the exclusionary aspects of the settlement negotiations, not any improper allocation of the evidentiary burden. More importantly, the stringent burden of proof on the issue of fairness suggested in General Motors was indicated as appropriate only when the settlement's proponents had in some manner improperly negotiated the settlement:
 
 
 58
 Thus, although the proponents of any class action settlement always bear the burden of proof on the issue of fairness, Manual for Complex Litigation § 1.46 at 56, proponents who improperly negotiate a settlement should bear the heavier burden of establishing fairness by clear and convincing evidence.
 
 
 59
 Id. at 1126 n. 30.
 
 
 60
 The appropriate burdens of proof and persuasion in the fairness hearing are those ordinarily applied in the settlement context as set forth in Armstrong v. Board of School Directors, 616 F.2d 305, 315 (7th Cir. 1980). District court approval of a settlement pursuant to Federal Rule of Civil Procedure 23(e) may be given only when the district court finds the settlement fair, reasonable, and adequate. Id. at 313. Among the factors identified as relevant to the fairness determination are: (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed. Id. at 314. Although the district court must clearly set forth in the record the reasons for approving the settlement in order to make meaningful appellate review possible, the court's reasoning need not be so specific as to amount to a judgment on the merits. Id. at 315. In short, the duty of the district court is to set forth the grounds upon which it concluded that the proponents of the decree in its entirety was fair, reasonable, and adequate. It is not the burden of the proponents or the duty of the district court to support individual elements of the decree under some evidentiary standard akin to that for findings of fact.
 
 
 61
 Of course, under this standard for purposes of imposing the burden of going forward with evidence, a district court may not assume a consent decree is prima facie fair and require the objectors to demonstrate its inadequacy, as IHDA claims the district court did in this case. Our review of the record, however, reveals that the district court correctly applied Armstrong in conducting the fairness hearing and approving the consent decree. In its attempt to demonstrate that the proponents did not meet the burden articulated in Armstrong, IHDA essentially reiterates the objections it expressed in the fairness hearing that were rejected by the district court. As this court noted in Armstrong:
 
 
 62
 Courts of appeals, in reviewing district court approval of class action settlements, engage in an even more limited inquiry than the district court.... Courts of appeals view the facts in the light most favorable to the settlement. In addition, they do not focus on individual components of settlements, but rather view them in their entirety in evaluating their fairness. Such deference is due the judgment of the district judge because of his familiarity with the litigants, the history of the litigation and the merits of the substantive claims asserted.
 
 
 63
 616 F.2d at 315 (citations omitted). The district court noted that the specifics of the decree are, in large part, extensions of the Letters of Understanding under which remedial efforts had been implemented for four and a half years.[15] In the district court, and in this appeal, IHDA's argument that the decree's proponents failed to carry their burden is primarily premised on the proponents' purported failure to rebut the opinions of IHDA's expert witnesses. The proponents of the decree demonstrated the fairness, reasonableness, and the adequacy of the decree, through, inter alia, the testimony of witnesses with expertise in supplying remedial housing. The court also was entitled to "rely heavily on the opinion of competent counsel" advanced by the proponents. Id. at 335. Here, differences in professional opinion advanced by the proponents that inevitably result from such complex remedial framework are not sufficient to justify concluding that the district court erred in finding that the proponents had carried their burdens of proof and of going forward, or that the district court failed to set forth adequately its reasons for approving the settlement.(3) The Adequacy of Discovery and the Notice to Class Members
 
 
 64
 These procedural objections may be briefly addressed. The only discovery IHDA was denied by the court was its request to take the deposition of Laurence B. Simons, HUD's Assistant Secretary of Housing, and its motion for HUD to produce a letter from HUD to the Department of Justice seeking the Department's approval of the terms of the decree, which the court deemed to be protected by the attorney-client privilege.[16] IHDA was permitted to take the depositions of four senior HUD officials involved in HUD's housing programs. Despite IHDA's protestations to the contrary, the permitted scope of discovery indicates that the effect of the court's denials, even assuming the district court abused its discretion in denying this discovery request, was not so prejudicial as to warrant reversal. IHDA's assertion that, "given the nature of this case," the district court erred in denying this discovery, appears to suggest that the district court must be held to some higher standard upon appellate review of an approved consent decree than that set forth in Armstrong. That is simply not the case. Again, General Motors is inapposite given the exclusionary negotiation methods and court's prohibition of any discovery concerning the negotiations in that case. As to the adequacy of the notice to the class members, HUD and the proponents of the decree point out IHDA has no standing to assert that the notice to class members was inadequate. It may not assert rights possessed by other individuals. Society Hill Civic Association v. Harris, 632 F.2d 1045, 1060 (3rd Cir. 1980). As IHDA has failed to rebut this argument, we need not address the adequacy of the notice to the class members.[17]
 
 
 65
 (4) The Finality of the Consent Decree
 
 
 66
 Without citation of any authority, IHDA attacks the decree as having failed to resolve finally the relief to be provided to the plaintiff class. Specifically IHDA objects to the number of years projected as necessary to provide the relief, the provision for reopening the decree after five years without cause, the provision for updating of the map and provisions to accommodate changes in programs or funding. Characterizing the motion for entry of the decree as a motion for entry of an interim injunction or a motion for modification of an injunction, IHDA also claims that, due to these alleged deficiencies, the district court failed to apply the proper standard of review, a standard which IHDA fails to articulate, for such allegedly interim relief.
 
 
 67
 This argument is, at best, difficult to fathom. Clearly, the duration of time necessary to implement a remedial plan cannot invalidate an otherwise valid remedial decree or order. It is not unreasonable to expect such a complex case of many years' duration to require many years of remedial efforts to rectify a systemwide constitutional violation. Nor do we find that the provisions for continuing court jurisdiction and modification of the decree under the decree are unfair or unreasonable. In the context of the decree as a whole, particularly in light of the complexity of the relief, changing demographics and vagaries of future budgets, these provisions are to ensure the continued effectiveness of the remedial efforts. Indeed, the failure to include provisions designed to accommodate changing circumstances would more likely raise issues of the decree's long-range viability than the inclusion of these provisions. We, therefore, find no basis for overturning the district court's approval of the decree based on these procedural objections or any of IHDA's other procedural objections.
 
 C. The Reasonableness of the Decree
 
 68
 IHDA raises several objections within the general rubric of alleging that the consent decree is unreasonable, capricious, and not in the public interest. As both IHDA and class member-appellant Ginger Mack challenge the criteria for the General, Limited, and Revitalizing Areas, these objections will be addressed in Part IV, infra. Herein we will address more generally IHDA's objections that the consent decree was unreasonable and that the district court failed to consider various interests affected by the decree.
 
 
 69
 IHDA criticizes the district court's evaluation of the decree as having failed to consider the effect on the public interest and the effects of the decree on third parties. This argument is without merit in light of the community interests represented in the fairness hearing and the district court's conclusion in its Memorandum Opinion that:
 
 
 70
 It is important to keep in mind that all parties concerned have the same goal-a fervent desire to see the development of safe, clean public housing which not only provides relief to the plaintiff class, but furthers integrated living and urban redevelopment-in short, a plan which makes Chicago a better place for all of us to live. No consent decree can please all those who are involved; this decree, however, provides for a workable program, one which can be enacted within the foreseeable future, and will be of benefit to the entire community.
 
 
 71
 523 F.Supp. at 672. No more explicit or extensive consideration of the public interest was necessary in the opinion. The entire thrust of the hearing was to devise a workable plan for providing integrated housing-a goal coextensive with the public interest to be served by a viable consent decree. We have previously found herein that the evidence presented in the decree was sufficient to sustain the proponents' burden of demonstrating that the consent decree was fair, reasonable, and adequate in serving this goal. IHDA's claim that the district court failed to address specifically the effects of the decree on third parties and IHDA's objections are a variation on IHDA's argument addressed in Part II.B. (2) supra. Our analysis in that section adequately serves to establish that no more detailed findings or conclusion were necessary than those in the district court's opinion.[18]
 
 
 72
 Similarly without merit is IHDA's claim that the remedy is disproportionate to the harm to be remedied. This claim is premised on IHDA's perception of the magnitude of relief already provided since 1976 pursuant to the Letters of Understanding. IHDA's argument, however, fails to acknowledge the seriousness, duration, and magnitude of the constitutional violation. Any relief already accorded cannot be said to have diminished substantially the harm done so as to render the present form of relief unreasonable or unwarranted.
 
 
 73
 IHDA's remaining challenges to the reasonableness of the decree focus on the viability of the decree and the map designating the General, Limited, and Revitalizing Areas. Its objections to the viability of the decree may be briefly addressed in light of our previous discussion. To sustain in part its argument that the decree is unworkable, IHDA essentially reiterates the objections it stated to the provisions of the decree which it claimed conflicted with the statutory and regulatory requirements.[19] As we noted in Part II.A., supra, the possibility, if any, that the decree's requirements may conflict with the statutory and regulatory requirement is remote. The provisions for waiver of the decree and regulations may be used to accommodate any difficulties.
 
 
 74
 No consent decree, particularly in such complex litigation as this, can ever resolve every question of implementation that might arise. If potential difficulties in implementation could render a consent decree invalid for unviability, few consent decrees would ever pass muster. As the district court acknowledged, the specifics of the decree were to a large extent extensions of the Letters of Understanding that had "proved workable for the past four and a half years," 523 F.Supp. at 672, and we find the viability of that plan is a persuasive indicator of the decree's viability.[20] See note 15 supra. As we have previously noted the district court was "entitled to rely heavily on the opinion of competent counsel," Armstrong v. Board of School Directors, 616 F.2d 305, 325 (7th Cir. 1975), that past experience indicated the decree was workable, over IHDA's projections of future difficulties.
 
 
 75
 IHDA's challenges to the mapping of the General, Limited, and Revitalizing Areas are that: (1) the decree does not contain a map of these areas; (2) notices to the class members did not contain a map or list of census tracts; (3) the designation of areas was not based on 1980 census data; (4) the General Area, contrary to the district court's assertion, did not have less than 30% minority concentration; (5) the Chicago SMSA should not have been used; and (6) changes in the mapping are left to HUD and the plaintiffs. Although the decree's exhibits do not include a map, the exhibits do identify by census tracts those areas included within the General, Limited, and Revitalizing Areas and a map was presented to the district court. Totally aside from the issue of whether IHDA may challenge the notice to class members, discussed previously herein, class members were informed that a map of the area was on file with the district court clerk. The district court did not abuse its discretion in refusing to postpone evaluation and promulgation of the decree for four months or longer until the 1980 census data became available. Moreover, designations in the decree are subject to reclassification under P 8.3 of the decree based upon the now available 1980 census data. As noted in Part II.A., supra, there was sufficient basis for metropolitan-wide relief and use of the Chicago SMSA in providing relief.
 
 
 76
 IHDA also claims that the district court erroneously stated that "each General Area census tract had 'less than 30% minority concentration.' " First, we note that the court said only that the General Area tracts as a whole had less than 30% minority concentration. 523 F.Supp. at 668. IHDA has not demonstrated this characterization to have been inaccurate. Moreover, the court's statement was nothing more than a rough characterization of the General Area for purposes of comparison with the 1969 Judgment Order, not in any sense necessary to sustain the court's approval of the decree.[21] Any misclassifications of census tracts in the General or Limited Areas based on 1980 census data may be modified under the provisions of the decree. Finally, the decree is not unreasonable in providing for modifications to the mapping at the instigation of HUD or the plaintiffs subject to court approval. The decree is sufficiently specific to avoid arbitrary designations, with the further safeguard of required court approval. HUD and the plaintiffs, as the parties primarily bound by the decree, are also the parties primarily responsible for the decree. In summary, we are unpersuaded by IHDA's arguments that the district court erred in approving the decree.
 
 
 77
 III. The Appeal of Rogers Park Community Council
 
 
 78
 RPCC challenges the designation of Census Tract 101, a portion of the Rogers Park community, as a Revitalizing Area. Before reaching its objections, we must determine whether the district court erred or abused its discretion in denying RPCC's motion to intervene. During the fairness hearing, the district court denied RPCC's motion but did permit RPCC to present its evidence against the decree in the hearing. After the entry of the decree, RPCC renewed its motion and moved for reconsideration of the consent decree. The court denied both motions.
 
 
 79
 To intervene as of right, the proposed intervenor must show under Federal Rule of Civil Procedure 24(a)(2): (1) timely application; (2) an interest relating to the property or transaction which is the subject of the action; (3) that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, and (4) that the interest is not adequately represented by existing parties. Wade v. Goldschmidt, 673 F.2d 182, 185 (7th Cir. 1982).
 
 
 80
 The RPCC includes fifty residents and property owners in Census Tract 101, claiming that subsidized new construction would lower property values. RPCC did not move to intervene until the fairness hearing, and was permitted to present its evidence in the hearing as if it were a formal party. RPCC has failed to demonstrate that its objections to the designation of Revitalizing, General, and Limited Areas were not adequately represented in this manner and by other parties to the suit, most notably IHDA and appellant Mack.[22] For these reasons, RPCC failed to satisfy the requisites for intervention of right. See, e.g., Wade v. Goldschmidt, 673 F.2d 182, 186 n. 7 (7th Cir. 1982) The same reasons militate against permissive intervention under Rule 24(b)(2).[23] RPCC's interests were adequately represented by its own representation and that of other parties so that formal intervention would have served no purpose and unnecessarily complicated and delayed an adjudication.[24]
 
 IV. The Appeal of Ginger Mack
 
 81
 Mack is a class member and resident of public housing in the Hyde Park-Kenwood area designated as a Revitalizing Area. Mack challenges the consent decree on three grounds: (1) that it authorizes the continuation of clearly illegal conduct; (2) that it provides an ineffective remedy; and, (3) that the criteria used for designating Revitalizing Areas are inadequate. Neither IHDA nor Mack challenges the concept of a Revitalizing Area per se, and Mack does not claim that, given the criteria employed in designating the Revitalizing Area, Hyde Park-Kenwood was improperly designated as within the Revitalizing Area.
 
 
 82
 In essence, Mack's first and second arguments are that the presently designated Revitalizing Areas contain substantial minority populations and concentrations of assisted housing and, therefore, the provisions of the decree which still permit assisted housing to be placed in those areas authorize the continuation of clearly illegal conduct and fail to remedy the discrimination. These arguments fail to meet the standard in Armstrong for a demonstration of clear illegality, but more importantly misconstrue the illegal conduct upon which relief is now predicated. It is not a constitutional violation to place assisted housing in areas with a substantial minority population. As adjudicated in this case, it is a constitutional violation to do so in order to limit assisted housing projects to areas with substantial minority population. The decree does not condone or perpetuate such illegal conduct. The decree limits the number of units which may be placed in the Limited Area to not more than one-third. Mack's argument that the decree continues segregation by permitting up to two-thirds of the housing units to be placed in the Limited Area and Revitalizing Area ignores the fact that the designation of the Revitalizing Area is predicated on its potential for an integrated, stable community based on criteria other than population statistics.[25] As the district court noted, the creation of the Revitalizing Area promotes integration by encouraging the development of assisted housing before land values and rents become prohibitively expensive and before low-income individuals are displaced by physical redevelopment. 523 F.Supp. at 671. Although the limits on housing for the Limited Area and Revitalizing Area might not be of the magnitude Mack would wish, that in itself does not render the decree invalid. See Armstrong v. Board of School Directors, 616 F.2d 305, 315 (7th Cir. 1980).
 
 
 83
 The question then becomes whether these criteria are unreasonable or inadequate. Mack claims that the criteria for the Revitalizing Areas are inadequate in that they do not include consideration of the impact on the neighborhood of additional assisted housing. "Revitalizing Area" is defined in the decree as areas of the city of Chicago having substantial minority occupancy and undergoing substantial physical development. Ten criteria were noted by the district court as factors considered in designating an area within the Revitalizing Area. They require consideration of whether an area is:
 
 
 84
 1) undergoing visible redevelopment or evidences impending construction; 2) located along the lakefront; 3) scheduled to receive Community Development Block Grant Funds; 4) accessible to good transportation; 5) an area with a significant number of buildings already up to code standards; 6) accessible to good shopping; 7) located near attractive features, such as the lake or downtown; 8) free of any excessive concentration of assisted housing; 9) located in an area which is not entirely or predominantly in a minority area and 10) not densely populated.
 
 
 85
 523 F.Supp. at 671. The designation of the Revitalizing Area does not necessitate that "racial tipping" be a consideration. Meaningful evaluation of any potential for racial tipping can be made more effectively at the time a specific project is proposed. HUD's regulations require exactly that, and thus would render superfluous the inclusion of such a criterion before designation of a Revitalizing Area could be made. Under the regulations a site for Section 8 New Construction must not be located in:
 
 
 86
 (1) An area of minority concentration unless (i) sufficient comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in that housing market area. An "overriding need" may not serve as the basis for determining that a site is acceptable if the only reason the need cannot otherwise feasibly be met is that discrimination on the basis of race, color, religion, creed, sex, or national origin renders sites outside areas of minority concentration unavailable, or
 
 
 87
 (2) A racially mixed area if the project will cause a significant increase in the proportion of minority to nonminority residents in the area.
 
 
 88
 24 C.F.R. § 880.206(c) (1981). The site and neighborhood must also be suitable from the standpoint of facilitating and furthering full compliance with the applicable provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, Executive Order 11063, and HUD regulations issued pursuant thereto. 24 C.F.R. § 880.206(b) (1981). King v. Harris, 464 F.Supp. 827, 837 (E.D.N.Y.), aff'd mem. sub nom. King v. Faymor Development Co., 614 F.2d 1288 (2d Cir. 1979), vacated, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980), upon which Mack relies for required consideration of racial tipping, stated that HUD's obligation to avoid unnecessary concentration of low-income and minority families is served by HUD's site and neighborhood standards, and reviewed the "tipping" impact of imminent construction in that context. Unlike King, any necessary consideration of racial tipping from imminent construction may yet be made by HUD pursuant to its regulations. "A consent decree need not in explicit terms require that the actions specified therein shall be carried out in conformity with all applicable federal, state and local law." Society Hill Civic Association v. Harris, 632 F.2d 1045, 1060 (3d Cir. 1980). It is sufficient that the decree does not authorize or require conduct in violation of the law. Id.
 
 
 89
 In sum, we reject Mack and IHDA's argument that the district court abused its discretion in approving the decree due to the inadequacy of the criteria. Given the adequacy of these criteria, there was ample evidence in the record for the district court to find that Hyde Park-Kenwood was appropriately designated as Revitalizing. 523 F.Supp. at 672. There was testimony in the fairness hearing that the area was redeveloping lake front property with a strong housing market and a stable, racially mixed population with potential for continued integration.
 
 V. Conclusion
 
 90
 In 1969, CHA was found to have discriminated on a systemwide basis in the placement of assisted housing. In 1971, HUD was found to have acquiesced knowingly in CHA's discriminatory practices. Having received vindication of their allegations of discrimination, the plaintiff class members proceeded to seek implementation of those determinations. Since 1971, the parties have repeatedly engaged in the Sisyphean task of advancing the issue of an appropriate remedy from the district court, to this court, to the Supreme Court, and to the district court again. The consent decree promises an eventual accomplishment of the original determinations of discrimination practices.
 
 
 91
 As the essence of settlement is compromise, a consent decree is never a totally satisfactory victory on all issues for all parties. The plaintiff class members and HUD, in this spirit of compromise, have negotiated what the district court found to be a fair and viable plan to remedy the continuing effects of the discriminatory practices. HUD has agreed to limit its discretion in the disbursement of federal funds accordingly. As this court noted in Armstrong:Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interest of the class and the public. Judges should not substitute their own judgments as to optimal settlement terms for the judgment of the litigants and their counsel.
 
 
 92
 616 F.2d at 315. The consent decree, and the efforts of the district court and the parties toward its realization, are a laudable attempt to accommodate individual and community interests, as well as the public interest, in providing adequate non-discriminatory public housing. We have evaluated in the course of our review each of the many objections to the decree raised in this appeal. We find no reversible error in the court's entry of the decree or abuse of discretion in that court's determination that the settlement was fair, reasonable, and adequate.[26]
 
 
 93
 For these reasons, therefore, the decision of the district court is
 
 
 94
 Affirmed.
 
 
 
 *
 Oscar H. Davis, Associate Judge of the United States Court of Claims, is sitting by designation
 
 
 [1]
 The judicial proceedings reported from 1966 on include the following: Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971); Gautreaux v. Chicago Housing Authority, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); Gautreaux v. Pierce, 538 F.Supp. 1009 (N.D. Ill. 1982); Gautreaux v. Pierce, 535 F.Supp. 423 (N.D. Ill. 1982); Gautreaux v. Chicago Housing Authority, 524 F.Supp. 56 (N.D. Ill. 1982); Gautreaux v. Chicago Housing Authority, 523 F.Supp. 684 (N.D. Ill. 1981), aff'd, 690 F.2d 601 (7th Cir. 1982); Gautreaux v. Landrieu, 498 F.Supp. 1072 (N.D. Ill. 1980); Gautreaux v. Chicago Housing Authority, 384 F.Supp. 37 (N.D. Ill. 1974), petition for writ of mandamus denied sub nom. Chicago Housing Authority v. Austin, 511 F.2d 82 (7th Cir. 1975); Gautreaux v. Romney, 363 F.Supp. 690 (N.D. Ill. 1973), rev'd sub nom. Gautreaux v. Chicago Housing Authority, 503 F.2d 930 (7th Cir. 1974), aff'd in part sub nom. Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); Gautreaux v. Chicago Housing Authority, 342 F.Supp. 827 (N.D. Ill. 1972), aff'd sub nom. Gautreaux v. City of Chicago, 480 F.2d 210 (7th Cir. 1973), cert. denied, 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98 (1974); Gautreaux v. Romney, 332 F.Supp. 366 (N.D. Ill. 1971), rev'd, 457 F.2d 124 (7th Cir. 1972); Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736 (N.D. Ill. 1969); Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D. Ill. 1967); Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D. Ill. 1967)
 
 
 [2]
 The Court stated that the relevant geographic area for remedial purposes would be the Chicago housing market. The Court noted with approval that in principal markets such as Chicago, the Chicago Standard Metropolitan Area (SMSA) is considered coterminous with the housing market area. 425 U.S. at 299 n. 15, 96 S.Ct. at 1547 n. 15
 
 
 [3]
 The first step in district court review of a class action settlement is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." Its purpose is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. Manual for Complex Litigation § 1.46, at 53-55 (West 1981). If the district court finds that a proposed settlement is "within the range of possible approval," the next step is the fairness hearing. Class members are notified of the proposed settlement and the fairness hearing in which they and all interested parties have an opportunity to be heard. The goal of the hearing is to "adduce all information necessary for the judge to rule intelligently on whether the proposed settlement is 'fair, reasonable, and adequate.' " Id. at 57
 
 
 [4]
 Throughout this opinion references to the "General Area," "Limited Area," or "Revitalizing Area," refers to the entire area encompassed by the relevant census tracts for each Area. References, for example, to "General areas" or "classification as a General area" are used to indicate individual census tracts included within the General Area
 
 
 [5]
 Eligible person is defined as any person who:
 (1) either (a) occupies family or handicapped public housing in the City of Chicago at any time prior to the termination of the decree, or (b) has applied to, and received, a registration number, from CHA, for family or handicapped public housing prior to the effective date of the decree;
 (2) is eligible for family public housing under applicable HUD and CHA regulations when assisted housing is offered to such person;
 (3) has never occupied assisted housing in either the General Area or Revitalizing Area; and
 (4) has not been offered and refused three opportunities pursuant to the decree to occupy assisted housing in the General Area or Revitalizing Area; and
 (5) has not been identified as a person declining to consider opportunities under the decree and living in assisted housing in the Limited Area.
 
 
 [6]
 In addition to these Section 8 programs, the definition of assisted housing includes the Public Housing New Construction and Acquisition program set forth in 24 C.F.R. Part 841 (1981), and Rent Supplement and Rental Assistance Payments programs set forth in 24 C.F.R. Part 215 and Part 236, subpart D (1981). The Public Housing New Construction and Acquisition program is the primary program under which CHA receives its funds. The Rent Supplement and Rental Assistance Payments programs are the forerunners to the Section 8 rent subsidy programs and have now been eclipsed in magnitude by the Section 8 programs. An exposition of the precise operation of these programs is not necessary to this appeal
 
 
 [7]
 For further elaboration on the division of duties, see South East Lake View Neighbors v. HUD, 685 F.2d 1027 at 1031-32 (7th Cir. 1982)
 
 
 [8]
 IHDA claims to take exception to the following provisions of the consent decree on appeal: (1) the 6%-12% requirement; (2) the 100-unit maximum requirement; (3) the no children above the third story requirement; (4) the 10% three bedroom requirement; (5) the locational and impaction requirements; (6) the mapping; (7) inability to terminate the Section 8 contract; (8) the exclusion of the public interest in the future; and (9) the open-ended nature of the decree. By its own admission, IHDA concedes that of the first five requirements, only the 6%-12% requirement "directly affects IHDA applying to each development financed by it." IHDA having failed to demonstrate any direct injury from these first five requirements other than the 6%-12% requirement, we do not need to address their validity in our evaluation of IHDA's appeal. Society Hill Civic Association v. Harris, 632 F.2d 1045, 1059-1060 (3d Cir. 1980); see also South East Lake View Neighbors v. HUD, 685 F.2d 1027 at 1034 n. 6 (7th Cir. 1982)
 
 
 [9]
 In part IHDA's objection is based on its misinterpretation of the provision. Paragraph 5.5.4.c does not prohibit foreclosure by IHDA on any project; it only prohibits a "sponsor" of a project to withdraw an individual unit occupied by an eligible person except under certain conditions. Under the applicable regulation, 24 C.F.R. § 880.504(a) (1981), an owner may not lease more than 10% of its assisted units in a project to ineligible families without approval from HUD in any event
 
 
 [10]
 In rebuttal, IHDA has pointed out that, inter alia, any waiver must be in writing upon determination of good cause, 24 C.F.R. § 899.101(a) (1981), and that no written waiver has been made. No waiver is necessary, however, as no clear conflict has been shown between the decree's provisions and those of the regulations and statute. The provisions for waiver are of significance insofar as they may be used to avoid any conflict when actual implementation of the decree begins
 
 
 [11]
 In Society Hill Civic Association v. Harris, 632 F.2d 1045, 1057-58 (3d Cir. 1980), the court was evaluating whether the complaint stated a claim upon which relief could be granted for which the allegations of conflict were viewed in the light most favorable to the appellant. It does not establish a lower standard of review for the illegality of a consent decree than that in Armstrong, as IHDA contends it does
 
 
 [12]
 This statement by the Court refutes IHDA's assertion that the potential repercussions of the decree on IHDA's financing capabilities constitute such interference with a local housing agency to invalidate the decree. Certainly cognizant of the crucial role of federal funds in supporting local agencies as a practical matter, 425 U.S. at 303 n. 19, 96 S.Ct. at 1549 n. 19, the Court nevertheless found that an order directed solely to HUD would not restructure local governments or use up any local decision-making authority as had been done in Milliken, because such an order would not force unwilling localities to apply for funds
 Moreover, we note that at least one of IHDA's fears of injury from implementation of the decree is misconceived. IHDA has claimed that it cannot operate without Section 8 funding because Section 103(b)(4)(A) of the Internal Revenue Code requires that a specified percentage of its units in a project be funded pursuant to Section 8 for the interest on its financing bonds to be tax exempt. However, Section 103(b)(4)(A), when read in conjunction with Section 167(k)(3)(B), requires only that the units be occupied by individuals of low or moderate income as defined by the Secretary in a manner consistent with the provisions of Section 8. There is no requirement that units actually be subsidized with Section 8 funds.
 
 
 [13]
 We need not address the merits of IHDA's motion to dismiss the second supplemental complaint against IHDA for failure to state a claim in light of our disposition of this appeal. See note 25 infra
 
 
 [14]
 Without benefit of any direct authority, IHDA contends that inclusion of IHDA in "post-agreement" negotiations only was not adequate inclusion. Nothing in General Motors or the facts of this case mandated that IHDA be allowed to participate more fully in the negotiations between HUD and the plaintiffs in their initial attempts to reach an agreement
 
 
 [15]
 We are cognizant of the differences between the remedial system under the Letters of Understanding and that under the consent decree. Despite those differences, both systems are sufficiently similar in the scope and manner of relief to warrant comparison. We agree, therefore, with the district court that the viability of the system under the Letters of Understanding lends support to the proponents' assertions of the decree's viability
 
 
 [16]
 The district court had denied without prejudice IHDA's motion to take the deposition of the Secretary of HUD, Moon Landieu, which motion IHDA did not seek subsequently to renew
 
 
 [17]
 In any event, we are unpersuaded that the 21-day notice period and the descriptive summary in the notice were inadequate under Federal Rule of Civil Procedure 23(c)(2)
 
 
 [18]
 The Ninth Circuit's decision in Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832 (9th Cir. 1976), is not authority to the contrary. In Mandujano the district court had failed entirely to address the central question of whether the class members had been adequately involved in promulgation of the settlement based on numerous procedural objections raised by the class members
 
 
 [19]
 Aside from the 6%-12% requirement, IHDA specifically challenges as unworkable the impaction requirement, locational requirement, the 10% three bedroom requirement, the 100 unit maximum, and the prohibition against children above the third story. IHDA again acknowledges that these requirements do not directly affect IHDA. See note 8 supra. In any event, our discussion adequately dispenses with these objections
 
 
 [20]
 The provision which IHDA appears to find most offensive as unviable, the 6%-12% requirement, IHDA concedes found its genesis in the Letters of Understanding
 
 
 [21]
 The decree simply defines "General Area" as "predominantly non-minority" and "Limited Area" as "predominantly minority." The proponents take the position that "minority" as used in defining the General and Limited Areas is based on the percentages of black population, a reasonable position in that the definition of the plaintiff class is limited to blacks. Although not necessary to our decision, we consider the proponents' interpretation reasonable although the definition of "eligible persons" is not limited to blacks and the definition of the Limited Area under the district court's 1969 Judgment Order was determined by black population. In both instances, it was clearly specified that groups other than blacks were included in any computation or definition
 
 
 [22]
 The only case cited by RPCC on this point is inapposite. In Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861 (8th Cir. 1977), the defendants (the mayor and members of city council) were defending against charges of discrimination and bad faith in their promulgation of an ordinance imposing a moratorium on the construction of abortion clinics in the community pending further study. A community group supported the moratorium on construction in their community. Although both the defendants and the community group were in a sense pursuing the same goal-upholding the ordinance-the Eighth Circuit noted that the defendants were actually concerned with showing that their actions were not discriminatory and the community group was concerned with the effect of construction on their property values. Additionally, the city council was split on the advisability of the ordinance and could easily be realigned in interest with the municipality in regard to the issues in litigation. Id. at 870. In contrast, a major focus of the objections of both IHDA and Mack is the proper designation of Revitalizing Areas and the impact of allegedly improper designations on those areas
 
 
 [23]
 Rule 24(b) provides in relevant part:
 Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
 
 
 [24]
 In light of our holding that Rogers Park had no right to intervene, we need not address the merits of its contention that Census Tract 101 was misclassified as a Revitalizing Area. We do note, however, while the determination might be a close one de novo, that we are of the view that the evidence was sufficient to sustain the determination in this appeal. In this sense, our discussion in relation to Mack's appeal is generally supportive of the classification of Census Tract 101 as a Revitalizing Area
 
 
 [25]
 For this reason, we reject Mack's contention that the continuing increase in minority population in the Revitalizing Area based on the 1980 census data invalidates the designation of the Area. The relief is predicated on the assumption that communities are continuing to suffer from the effects of past discrimination. Potential for integration may be reasonably based on factors other than current demographics, such as physical redevelopment and access to transportation
 
 
 [26]
 The proponents of the decree have stated that they will seek voluntary dismissal of the second supplemental complaint against the additional defendants named, including IHDA, upon our upholding of the consent decree. We, therefore, need not address the merits of IHDA's motion to dismiss the complaint