**Murray SEIDEN et al., Plaintiffs,**

v.

**Elmer L. NICHOLSON et al., Defendants.**

**No. 74 C 3117.***

United States District Court
N. D. Illinois, E. D.

Aug. 17, 1976.

---

* And the following related cases: Nos. 74 C 3642, 75 C 0347, 75 C 0130, 75 C 0415, 75 C 0196, 75 C 0553, 75 C 0272 and 74 C 0603.

Lawrence Walner, Perry Goldberg, Chicago, Ill., David Berger, Philadelphia, Pa., Melvyn I. Weiss, for plaintiffs.

Don H. Reuben, Gary M. Elden, Shane H. Anderson, Kirkland & Ellis, Chicago, Ill., for CNA Financial Corp. and its subsidiaries.

A. Bruce Schimberg, Robert D. McLean, George A. Platz, John G. Levi, Sidley & Austin, Chicago, Ill., for defendant Peat, Marwick, Mitchell & Co.

Richard E. Mueller, Lord, Bissell & Brook, Chicago, Ill., for defendant Kenneth Leventhal & Co.

Keith F. Bode, Jenner & Block, Chicago, Ill., for defendant Winterthur Swiss Ins. Co. and Dr. Hans Braunschweiler.

David J. Krupp, Devoe, Shadur & Krubb, Chicago, Ill., for defendant Loews Corp.

Lionel G. Gross, Kenneth R. Gaines, Altheimer & Gray, Mitchell S. Rieger, Aaron J. Kramer, Schiff, Hardin & Waite, Edward L. Foote, Winston & Strawn; Paul Noland, Greenberg, Keele, Lunn & Aronberg, Chicago, Ill., for other defendants.

## MEMORANDUM OPINION

ROBSON, Senior District Judge.

This cause is before the court on the parties' motion to approve a settlement pursuant to Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure. Two persons (who are associated together in business ventures) have jointly filed objections to the proposed settlement. For the reasons hereinafter stated, the settlement is approved and the objections are overruled.

The court has considered: the history of the proceedings; the amount of discovery completed; the reaction of the class to the settlement; the risks and difficulties of establishing liability; the risks and difficulties of establishing damages; the complexity, expense and likely duration of the litigation; and the range of reasonableness of the settlement fund as compared to a possible recovery in light of all the attendant risks of litigation. *See City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 463 (2d Cir. 1974).

*Background of the Litigation*

This case was previously discussed in the ruling granting (in part) plaintiffs' motion to certify a class. *Seiden v. Nicholson,* 69 F.R.D. 681 (N.D.Ill.1976). This case is a combined class action and derivative suit under the Securities Exchange Act of 1934, §§ 10(b), 14, and 20, 15 U.S.C. §§ 78j(b), 78n, and 78t, rules promulgated thereunder, and principles of common law. The primary corporation involved is CNA Financial Corporation (CNA).

The case involves CNA's business affairs from 1969 through 1974. During those years, CNA was primarily in the insurance business through two of its subsidiaries, also defendants herein, Continental Casualty Company and Continental Assurance Company. Another subsidiary of CNA, The Larwin Group, Inc. (with its affiliates and

subsidiaries, hereinafter called "Larwin"), was acquired in 1969, is in the real estate business, and was also named as a defendant. The other defendants include Loews Corporation (Loews), which acquired more than fifty per cent of CNA in late 1974 by means of a tender offer; Winterthur Swiss Insurance Company (Winterthur), which has had considerable business dealings with CNA, including in the reinsurance field; Peat, Marwick, Mitchell & Co. (Peat, Marwick), CNA's primary auditor; Kenneth Leventhal & Company, Larwin's auditor; and more than two dozen CNA executives, officers, or employees.

Beginning in third quarter 1973 and continuing through third quarter 1974, Continental Casualty Company suffered a series of unprecedentedly large increases in its insurance reserves, causing over $100 million of reported losses in the five financial quarters involved. Between third quarter 1973 and third quarter 1974, Larwin lost substantial amounts of money and eventually had to be written off as a total loss by CNA. In part as a result of these two unfavorable developments, the price of CNA common stock dropped from $19 per share in July 1972 to $14 per share in July 1973 to $8 per share in July 1974 to less than $3 per share in late 1974.

During middle and late 1973, Gulf Oil Corporation (Gulf Oil) entered into preliminary negotiations with certain members of CNA management, leading to an agreement in principle to merge the two companies, which was announced in early October, 1973. Shortly thereafter, CNA announced losses from Larwin and reserve increases all relating to third quarter 1973. The proposed merger aborted. In April 1974, Loews indicated an interest in making a tender offer for CNA. In November, the tender offer was consummated at $5 per share for common stock and $6.75 per share for preferred stock. Between April and November, CNA announced more Larwin losses and reserve increases. During 1974, Winterthur engaged in purchases of CNA stock, allegedly to forestall the Loews tender offer and thereby protect the CNA-Winterthur reinsurance business.

In March 1974, a derivative suit was filed on behalf of CNA against certain of the principals of Larwin. Between October 1974 and February 1975, eight additional actions were instituted in various jurisdictions; some were class actions, some were derivative suits, some were both. The nine actions together broadly covered all of CNA's activities from January 1, 1969 through December 31, 1974, including the losses in Larwin, the increases in reserves, the unsuccessful Gulf Oil merger, the successful Loews tender offer, and the business relations between CNA and Winterthur. Pursuant to 28 U.S.C. §§ 1404 and 1407, all the matters were consolidated in Chicago in early 1975.

The numerous plaintiffs thereupon organized themselves into a four-lawyer Executive Committee, and the defendants selected a Liaison Counsel to act on their behalf, which the court sanctioned by a pretrial order. The Executive Committee began to administer the consolidated proceedings on behalf of the plaintiffs. When eventually a class was certified and four class representatives were named, the Executive Committee continued to administer the action on behalf of the class. The Executive Committee also claimed to represent CNA insofar as derivative claims were pleaded. The court requested the Executive Committee to file a consolidated complaint superseding all the prior complaints in order to facilitate proceedings in this case. During early April 1975, such a complaint was filed.

*Plaintiffs' Discovery*

Even prior to the filing of the consolidated complaint, the Executive Committee and the individual plaintiffs had each made investigations of the facts of the case, including securing copies of documents filed by CNA with the Securities Exchange Commission. These documents described most of CNA's history between 1969 and 1974 and contained full financial statements. Plaintiffs secured papers from a previous

case in which Loews had alleged that Winterthur (and others) were interfering with the Loews tender offer.

Between April and November 1975, the parties engaged in "first wave discovery." See *Manual for Complex Litigation*, § 2.20 (1973 ed.). Defendants filed several lengthy responses to eight different lengthy sets of interrogatories which plaintiffs had previously served. The responses contained both many objections and much information. Pursuant to local General Rule 12(d) and with the urging of the court, the parties sought to resolve their differences and to begin producing documents without the protracted motion practice that often arises in cases of this nature. Although there were some isolated instances of acrimony and a few matters which were brought to the court for resolution, for the most part the Rule 12(d) proceedings were frequent, efficient, and productive, eliminating the need for full formal discovery proceedings.

Primarily by agreement among the parties, detailed ground rules for discovery were established. Two document depositories were opened. Provisions were made for copying and transporting to the depositories all of the work papers for both defendant accounting firms for the entire relevant six-year period. Winterthur transported documents from Switzerland to Chicago. Procedures were adopted for reviewing the documents both at the depositories (where desk space for ten lawyers was provided) and elsewhere. By mid-November 1975, the parties reported that more than 500,000 pages of documents had been produced in the depositories and by late-January 1976, close to 1,200,000 pages of documents had been produced. In addition, plaintiffs reviewed the files of certain nonparties, including an accounting firm which audited Larwin in 1969.

The nine groups of plaintiffs' lawyers (perhaps thirty lawyers in all) divided up the documents, reviewed them, prepared outlines and index cards on them, and coordinated their work so that between the months of November 1975 and March 1976 they substantially completed review of all the relevant documents which had been produced. Plaintiffs were assisted in their work by the accounting firm of J. K. Lasser & Co., which was retained by the Executive Committee. The Executive Committee made plans during April 1976 for an extensive battery of depositions which took place during May 1976. The Executive Committee again divided the work among several counsel, thereby permitting depositions to proceed simultaneously in two cities. Altogether twenty depositions (most approximately one day long) were taken on the merits, in addition to the more than twenty depositions which had previously been taken on various other aspects of the case.

The court was kept fully informed in a detailed way on the progress of the document production, the types of documents produced, and the manner in which plaintiffs and defendants were administering document discovery. The court had an opportunity to review what appeared to be key documents and depositions. Based on the above matters and the factual presentation made by plaintiffs' Executive Committee at the settlement hearing, the court finds that extensive discovery was taken in this case and that an adequate basis existed for plaintiffs' counsel to evaluate the case and undertake settlement negotiations.

*Notice to and Reaction from the Class*

While the above discovery proceedings were in effect, plaintiffs and defendants began discussing settlement and reported to the court on their progress in that connection. The parties told the court that, as an essential part of settlement negotiations, defendants' counsel made certain representations as to what the evidence would ultimately show with respect to certain defenses in the case. It was understood among all the parties that negotiations were contingent upon later discovery confirming those representations. By the end of May 1976, after conducting extensive discovery, plaintiffs were apparently satisfied as to the strength of the various defenses, and the parties reached an agreement in principle to settle the case. Thus began several weeks

of negotiations on the details of a settlement agreement. This not only involved releases and indemnifications as between plaintiffs and defendants but also involved many terms affecting the defendants *inter se.* The court was shown preliminary drafts of settlement agreements and was advised of the progress of negotiations. Finally, on June 15, 1976, the parties presented the court with a set of proposed settlement papers. The court preliminarily approved these papers and ordered that a notice be sent pursuant to Rules 23 and 23.1 of the Federal Rules of Civil Procedure.

The parties mailed notices and claim forms to 11,000 members of the National Association of Security Dealers, all persons on CNA's current shareholder list, and all persons who had made transactions of record in common or preferred CNA stock during the class period (January 1, 1969 through December 31, 1974) or within a month thereafter. In addition, notices and claim forms were printed in the Wall Street Journal and the Chicago Tribune. The notices and claim forms occupied approximately an entire page of print in both of those newspapers. The notices set forth a formula for allocating the settlement fund among the class members and described the releases, indemnities, and other key terms of the settlement agreement.

More than 20,000 persons filed claims in response to the class notice. More than thirty claimants had over $1 million in "computed amounts" (a defined term in the settlement agreement which roughly approximates the maximum losses sustained from all causes, whether actionable or not). The largest single claimant, The Dreyfus Fund, Inc., had a "computed amount" of more than $20 million. Dreyfus was originally made a party to this case through a derivative suit and was accordingly represented both by its counsel and by the plaintiff's counsel who filed the derivative suit. Both sets of lawyers had access to the document discovery in this case and were kept abreast of all proceedings in the case.

Other large claimants were brokerage houses and major banks in Chicago and throughout the country (purchasing both on their own behalf and on behalf of clients to whom they owed a fiduciary duty), mutual funds, pension funds, and other sophisticated investors. All elected to be part of the class in this case rather than to opt-out or to object to the terms of the settlement. At no time did any of these substantial traders and holders of CNA stock make any complaint concerning any of the terms of the settlement or any other facet of the case.

Only two persons objected to the settlement in question, Barry Silverstein and Dennis McGillicuddy. McGillicuddy did not buy any shares in CNA until September 1975, after the class period ended and more than a year after the initial complaints were filed in this case. Silverstein also purchased shares in CNA during 1975 although he made his first purchases in 1974.

Both Silverstein and McGillicuddy are lawyers who have had extensive business dealings and legal conflicts with CNA totally unrelated to this lawsuit: (a) CNA has loaned or invested more than $10 million in entities controlled by Silverstein and McGillicuddy. (b) In a case pending before this court and in another case pending in a federal district court in Ohio, Silverstein and McGillicuddy (directly and through entities they control) have sued CNA for millions of dollars. The earliest of these suits was filed in June 1975, three months before McGillicuddy purchased his first CNA shares. (c) CNA brought a suit in Delaware against a corporation controlled by Silverstein and McGillicuddy alleging that, although CNA had become a 51% shareholder, Silverstein and McGillicuddy had prevented CNA from having proportionate representation on the board of directors by unlawfully delaying a shareholder meeting. (d) Silverstein has been attempting to prevent CNA and Loews from having broadcasting license applications approved by the Federal Communications Commission.

In short, it is clear from documents prepared by Silverstein and McGillicuddy that they are embroiled with CNA in a series of conflicts for large stakes. Under

these circumstances, one must view with skepticism the claim of Silverstein and McGillicuddy that they are challenging the instant settlement because it is unfair to CNA. Objections to class action and derivative settlements cannot be used to gain leverage in other disputes. Objectors cannot enter a proceeding purporting to protect a corporation or a class and instead use the proceeding for their own ulterior purposes that could harm the interests of the class and corporation by delay, expense, confusion, and the loss of a favorable settlement.

In considering a proposed settlement, the court should give weight to the fact that numerous class members filed claims while only a small number objected to the proffered settlement. *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 462 (2d Cir. 1974); *Hill v. Art Rice Realty Co.*, 66 F.R.D. 449, 456 (N.D.Ala.1974), *aff'd*, 511 F.2d 1400 (5th Cir. 1975). In the instant situation, such a consideration is of special impact since the only objectors to the settlement are persons whose motives are extremely suspect, the claimants are numerous, and many claimants are sophisticated investors with large amounts at stake.

*Risks and Problems in Establishing Liability*

In evaluating liability in a case where settlement has been proposed, courts attempt to avoid the trial of disputed issues since the very purpose of a compromise is to avoid the expense and difficulty that litigation entails. *Newman v. Stein*, 464 F.2d 689, 691–92 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *Grunin v. International House of Pancakes*, 513 F.2d 114, 124 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The court need merely evaluate whether plaintiffs are confronted with problems and risks in proving their case. Based upon the record before it, the court finds that such risks and problems are substantial.

1. *Insurance reserves.* Plaintiffs' thorough review of internal CNA, Continental Casualty Company and Peat, Marwick documents disclosed that numerous studies were made between 1972 and 1975 in an attempt to determine appropriate levels for casualty reserves. As information became available to CNA's actuaries, reserve corrections were made. When those reserve corrections seemed to be inadequate in light of later data, new people were requested to make independent studies and further reserve increases were made based on those studies. In each case, the memoranda and outside studies noted that jury verdicts, inflation, hospital costs, and substantive law began to change in a fundamental and unexpected manner during late 1973 and 1974. The studies repeatedly noted the difficulties that actuaries have in setting reserves in the midst of such fundamental changes in underlying data.

CNA's reserve base significantly increased during the years in question to more than $1 billion. The relevant reserve increases (between $20 million and $40 million per quarter) were each approximately five per cent of the total reserve base. Written studies produced by defendants explained how such shortfalls could be attributed at least partially to the uncertainty inherent in estimating, which is the essence of the reserving process. Double-digit inflation had an impact on all insurance companies during the 1973–1975 period and caused many of them to take substantial and unprecedentedly large reserve corrections. As a result, there was a substantial drop in the prices of the stock of all insurance companies during 1972–1974. CNA's stock prices largely paralleled the prices of other insurance stocks.

Plaintiffs face a real risk that they could show at most differences of opinion among actuaries and a certain degree of confusion and uncertainty during the period in question and that they therefore would be unable to prove their allegations that insurance reserves were deliberately misstated with an intent to defraud, deceive, or manipulate. *Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

2. *Real estate.* While almost all insurance companies performed poorly during 1973–1975, almost all real estate companies faced disaster. CNA's real estate subsidiary, Larwin, had excellent earning years in 1971–1972 (along with the rest of the real estate industry), fell upon hard times during late 1973, and ultimately had to be written off in late 1974. Over $100 million in losses were reported by CNA in 1974 alone due to Larwin. Defendants list numerous other large real estate companies that suffered a similar fate at the same time. Defendants contend that approximately eighty per cent of major previously profitable real estate companies went into reorganization, bankruptcy, or insolvency during the period in question. Defendants cite statistics concerning the dramatic increases in the cost of lumber, the drying up of mortgage money, and other matters which could have explained most if not all of the misfortune that befell Larwin. The court is aware that many Real Estate Investment Trusts (REITs) managed by some of the most sophisticated money managers in the nation became insolvent or nearly so during 1973–1975.

Plaintiffs investigated work papers and deposed Larwin principals in an attempt to show the impropriety of many of the accounting procedures and disclosures respecting Larwin. Plaintiffs challenged the valuation of real estate, estimates concerning potential profits on multi-year building projects, and other complex and technical transactions. If this case had been tried to its conclusion, the court would have had to rule upon a series of involved controversies between experts: appraisers arguing over the proper value of a piece of property during a prior year; estimators arguing over what could reasonably have been anticipated two years ago to have been the cost of lumber today; accountants arguing over whether a down payment was sufficiently large to justify a closed transaction; etc. All such disputes have in common is that they are generally difficult to decide, costly to present, and uncertain in outcome.

Without re-examining all the evidence summarized by plaintiffs' lead counsel at the settlement hearing and set forth in more detail in the several depositions bearing on Larwin, the court concludes that litigation of the Larwin issues would have been extremely complex and uncertain. If liability were established, plaintiffs would still have the problem of proving that CNA or investors would not have lost as much money if different accounting and disclosure practices had been followed. Since Larwin accounted for only a fraction of CNA's income during the years in question, even a substantial change in Larwin earnings might not have had a substantial impact on the price of CNA stock. CNA was at all times primarily an insurance company.

3. *Other issues.* The Gulf Oil merger negotiations aborted primarily because of CNA's announcement of adverse developments for third quarter 1973. The court agrees with plaintiffs that they would have faced difficulties in proving that CNA could or should have done anything differently to effectuate the Gulf Oil merger.

With respect to the Loews tender offer, plaintiffs' main theory was that CNA improperly caused delay in its consummation, while stock prices dropped. In litigating this issue, plaintiffs would have problems of proof respecting how long insurance departments normally take to approve applications of companies like Loews; whether CNA did anything that caused a delay in such approvals (or otherwise); whether any delay actually caused damage to shareholders; how far the court should go in second-guessing management's decisions to make inquiries concerning the intentions, operations, philosophy and personnel of a tender-or trying to enter a regulated industry for the first time; and other similar problems.

Primarily because of the comprehensiveness of plaintiffs' allegations, some additional matters are also involved in this case. All of these matters can fairly be characterized as minor or as having only remote

prospects of success. For example, plaintiffs originally alleged that Winterthur took advantage of CNA, but the fact is that Winterthur probably lost money in its CNA dealings. One of the counts concerns the manner in which Loews consummated its tender offer. Not only would it be very difficult to prevail on that count, but the claims of damages are trivial.

Overall, plaintiffs may have had some triable issues, but they would have been faced with significant problems in establishing liability.

### Risks and Difficulties in Establishing Damages

The settlement fund created for the class in the instant case is $9.5 million. Defendants agreed not to make claims against the settlement fund. This fact is significant since Loews owned at certain times during the class period almost five per cent of the outstanding CNA stock, Winterthur owned varying amounts approximating five per cent, and the individual defendants seem to have owned about fifteen per cent of the outstanding stock and perhaps more. Obviously, the agreement of defendants not to make claims against the settlement fund substantially increased the ratable share of each participating class member.

If this case had gone to trial, and if plaintiffs had been successful in establishing some of their claims, they still would have been faced with the difficult problem of proof of damages. The drop in CNA stock prices roughly reflected the experience in other similar companies. At the conclusion of any trial in this case, the finder of fact would undoubtedly have been treated to conflicting testimony of expert stock analysts as to how much of the drop in CNA stock prices was attributable simply to non-actionable economic conditions. In view of the major economic forces tending to depress CNA stock prices after 1972, defendants would surely have argued that many of the matters alleged by plaintiffs were not even material to an investor. See *TSC Industries, Inc. v. Northway, Inc.*, 426

U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

If this case had been litigated to conclusion, all that is certain is that plaintiffs would have spent a large amount of time, money and effort. Not only would there have been difficulties in proving the defendants liable, but there would be the problem that if liability was established, the plaintiffs might not have been able to prove damages.

■ The court concludes that the class was benefited by the prompt and substantial cash settlement achieved in this case.

### Other Matters

■ The releases given by the class and CNA in large part formalized what the parties would have been entitled to under the doctrines of *res judicata* and collateral estoppel even without releases. To the extent the releases go somewhat beyond what is required by those doctrines, the court finds that such releases are reasonable and customary in the settlement of all cases. Recently a court enforced a class action settlement which "permanently barred and enjoined [class members] from instituting or prosecuting, either directly or representatively, any other action, claim or proceeding against the named defendants, . . . which has been or could have been, asserted arising from or relating to the matters alleged in the complaint." *Hendler v. Wohlstetter*, 411 F.Supp. 919, 922 (S.D.N.Y. 1975). The releases in this case accomplish substantially the same thing as the provision enforced in the *Hendler* case.

The complex indemnification provisions among the defendants, including the provisions for costs, fees, and expenses, are proper and reasonable. It would needlessly extend this opinion to discuss them at length. In considering the indemnification provisions, as well as the settlement of the derivative suit, the releases, and the other provisions affecting CNA, the court was aware that CNA has been represented not only by plaintiffs' counsel suing derivatively but also by highly competent defense counsel who have frequently appeared before this

court in complex cases and have vast and nationwide experience in the field. The court is confident that such counsel, the newly-constituted CNA board, and Loews (as majority shareholder of CNA) have all made themselves aware of the relevant aspects of the settlement in this case and have exercised their respective judgments that the settlement is in the interest of CNA. As the court held in· *United Founders Life Insurance Co. v. Consumers National Life Insurance Co.*, 447 F.2d 647, 655 (7th Cir. 1971), "the business judgment of the court is not to be substituted for that of the parties whose business is involved." In settling a derivative suit, management can properly take into account the "debilitating and demoralizing effect" on a corporation's business, management, staff, shareholders and policyholders. *Id.* at 656. The court is satisfied that CNA is benefited and assisted by the total settlement in this case.

■ Having disposed of the foregoing matters which go to the heart of the settle-ment of this case, the court reviewed again the substance of the objections. Many of them are based on misconceptions and inaccuracies. A few are remotely related to some of the factors which the court has already considered. In cogency, they range from unpersuasive to frivolous. Overall, they are so poorly developed and unsubstantiated that they do little to illuminate the relevant issues. It is unnecessary to extend this opinion to discuss the objections except to state that each of them is denied in total for the reasons stated above and for reasons apparent in the record.

The court has entered an order submitted jointly by plaintiffs and defendants to meet the requirements of the settlement agreement. The court entered that order on August 10, 1976, with a finding that there was no just reason to delay its appeal. This memorandum opinion shall serve as an outline, explanation and elaboration of the court's reasons for entering that order.