Winard **ANDERSON, et al., Plaintiffs,**

v.

**The TORRINGTON COMPANY, Defendant.**

No. S85–483.

United States District Court, N.D. Indiana, South Bend Division.

Jan. 22, 1991.

See also 694 F.Supp. 1342.

Richard J. Swanson, Indianapolis, Ind., Timothy P. McLaughlin, Joseph V. Simeri, South Bend, Ind. (limited appearance for some objecting plaintiffs), for plaintiffs.

Roger W. Benko, Franklin A. Morse, II, Douglas D. Small, South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This case is before the court for approval of a proposed settlement of a class action. Several members of the class have filed objections and were heard on January 26, 1990. On March 12, 1990, the court directed the parties' counsel to file memoranda outlining the proof that would be submitted at trial. Following several extensions of time, those submissions have been made, and the matter finally is ripe for ruling. For the reasons that follow, the court concludes that the settlement should be approved.

In 1984, the Torrington Company, a large employer in South Bend, Indiana, closed the doors of its South Bend plant, leaving hundreds of workers unemployed. Former Torrington workers filed this class action suit in August, 1985. Following amendments, the complaint now alleges that Torrington closed its South Bend plant because of the age of the work force, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and further violated the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*

### I.

Following years of discovery by class counsel and counsel for Torrington, the parties submitted a proposed settlement to the court. Three sub-classes would receive varying modest base sums, and an additional benefit would inure to some members of two of the sub-classes. Each ADEA class member would receive a base sum of $1,000.00 and an additional amount equal to $103.00 per year of service in excess of ten years. Each ERISA class member with at least ten years of service would receive $1,000.00. Each ERISA class member with at least eight and a half, but fewer than ten, years of service would receive $500.00. The additional benefit, which is available to all qualifying class members regardless of the nature of the claim, reflects health insurance benefits: each class member with at least ten years' continuous service with Torrington at the time of his or her layoff who was at least 55 years old on January 1, 1988 and who is not presently covered by Torrington's group health insurance would have the option of receiving $5,000.00 or lifetime group health insurance for themselves and their families with the costs of the premiums to be divided evenly between Torrington and the class member.

Accordingly, the settlement would provide the following monetary benefits:

(1) all ERISA plaintiffs with less than ten years service with Torrington would receive $500.00;

(2) all other plaintiffs, regardless of nature of claim, would receive at least $1,000.00; ADEA plaintiffs would receive an additional $103.00 per year of service in excess of ten; and those plaintiffs with at least ten years of continuous service and who were born before January 2, 1933 would receive, at their option, either $5,000.00 or lifetime group health insurance with half the cost to be borne by Torrington.

Class counsel believe the proposed settlement would cost Torrington at least $1.106 million, a sum that may increase if class members opt for the health insurance coverage. Class counsel reported that the class consists of 352 persons (206 are ADEA plaintiffs, 79 are ERISA plaintiffs with ten or more years of service, 67 are ERISA plaintiffs with less than ten years of service). Eighty-three class members would qualify for the health insurance option.

On November 21, 1989, the court gave the settlement preliminary approval and directed notice to class members. Class members originally were given to December 28, 1989, and then to January 19, 1990, to opt out of the class or file objections. No class member opted out. Twenty-six persons filed objections (two objectors, Gilbert Pittman and Joseph Riggs, filed two). One of those objections, however, included a petition signed by 109 persons, contending that the proposed settlement "is unfair in respect to lost wages, retirement benefits, and health care insurance." Whether each of the petition's signatories is a class member is unclear, and all but nine of the

persons who filed separate objections also signed the petition. Accordingly, the best that can be said is that not more than 118 persons have objected in one form or another.

The nature of those objections varies. The petition signers each claim that the compensatory damages are inadequate. The separately filed objections raise the following grounds for objection:

 a. Insufficient notice to class members (A. Friebe);

 b. Insufficient contact with, or explanation from, class counsel (A. Friebe, G. Pittman, L. Noens, E. Coryell, A. Fabyan);

 c. Overcompensation of class counsel (R. Rems);

 d. Failure to include the local union in settlement negotiations (A. Friebe, R. Rems, E. Trzaskowski);

 e. Inclusion of grievance in settlement (G. Dooms, L. Noens);

 f. Inequitable distribution of settlement fund (L. Kinner, H. Evans, J. Riggs, R. Dudeck);

 g. Unfavorable comparison to Torrington's settlement with salaried workers at the time of the plant closing (A. Friebe, R. Rems, W. Egyhazi) and rights of those who retired from Torrington before the closing (C. Egyhazi);

 h. Lack of improvement over Torrington's first settlement offer (C. Deranek, R. Rems, E. Trzaskowski, A. Prathaftakis);

 i. Failure to provide remedy for toxic torts such as exposure to asbestos (A. Friebe);

 j. Inappropriate direction of the litigation and settlement by the International union (A. Friebe, C. Deranek, L. Noens);

 k. Failure to provide a trial that would disclose important information (A. Friebe, R. Rems), and demonstrate Torrington's intentional misconduct and basic unfairness in handling the plant closing (S. Deranek, L. Noens, O. Broadnax, R. Dudeck);

 l. Insufficient provision for health benefits, insurance and pensions (I. Duddleson, J. Riggs, G. Pittman, W. Egyhazi, L. Noens, E. Trzaskowski, R. Czarnecki); and

 m. Improper classification or omission of class members (C. Botka, G. Pittman, W. Kodba, J. Kolat, H. Evans, J. Riggs, J. Cyra, A. Fabyan, E. Fabyan).

In addition, some objectors complain of the settlement's failure to reflect their pain and suffering after the closing (W. Egyhazi, C. Egyhazi).

Thirteen objectors spoke (some more than once) at the January 26, 1990 hearing. Those objectors eloquently articulated the pain caused by the Torrington closing. Aladar "Bill" Fabyan related that in the year following the closing, Torrington's former South Bend work force suffered twenty-two commitments for alcoholism and six suicides, and that since the closing former Torrington employees have suffered ninety-five heart attacks. Richard Leeper told of being out of work for a year and a half following the closing while his wife spent two years in counseling to deal with her grief over her husband's loss of his job. Carl Egyhazi spent many sleepless nights during the year and a half it took him to find even a job paying four dollars an hour. Josephine Cyra, who was fifty years old when laid off for the final time, worked for a year at minimum wage. Bill Egyhazi could not find work at age fifty-eight, then finally found work at four dollars an hour before being laid off at his new job. Lawrence Noens told of his losing his family and material things, as his age hampered him from obtaining work for more than minimum wage.

## II.

 As a rule, courts favor settlement of disputed claims, including class actions. *Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, 307 (7th Cir.1985); *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.,* 630 F.2d 1164, 1166–1167 (7th Cir.1980), *rev'd in part on other grounds,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977). Again as a general rule, courts will not substitute their own thoughts for the

parties' business judgment in arriving at a settlement. *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir.1976); *United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir.1971). In the class action area, however, courts have a special responsibility with respect to proposed settlements, in recognition that many persons interested in the suit may have had minimal involvement in the negotiations, *Armstrong v. Board of School Directors*, 616 F.2d 305, 313 (7th Cir.1980), and in some cases, that the attorneys may be motivated by considerations other than the class's best interests. *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 681 (7th Cir.1987). Accordingly, a class action may be settled only if the court determines that the settlement is fair, reasonable and adequate. *Donovan v. Estate of Fitzsimmons*, 778 F.2d at 307–308; *Armstrong v. Board of School Directors*, 616 F.2d at 313. In making this determination, the court sits as a disinterested third party, *Boggess v. Hogan*, 410 F.Supp. 433, 437 (N.D.Ill.1975), *supplemented*, 410 F.Supp. 443 (1976), a guardian of those not directly involved in the negotiations. *Liebman v. J.W. Petersen Coal & Oil Co.*, 73 F.R.D. 531, 534 (N.D.Ill.1973).

█ While a district court has considerable discretion in determining whether a proposed settlement is fair and reasonable, *Madison County Jail Inmates v. Thompson*, 773 F.2d 834, 845 (7th Cir.1985), special care must be exercised. *Mars Steel v. Continental Illinois Nat'l Bank*, 834 F.2d 677, 681 (7th Cir.1987); *In re General Motors Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). The settlement's proponents bear the burden of demonstrating its fairness, and no presumption of fairness aids the proponents in meeting that burden. *Gautreaux v. Pierce*, 690 F.2d 616, 630, 631 (7th Cir. 1982), *aff'g* 523 F.Supp. 665 (N.D.Ill.1981).

█ In this circuit, a district court must evaluate several factors in determining whether a settlement is fair, reasonable and adequate:

> The factors which a district judge should consider are well established: the strength of the plaintiff's case on the merits measured against the terms of the settlement; the complexity, length and expense of continued litigation; the degree of opposition to the settlement; the presence of collusion in gaining a settlement; the opinion of competent counsel as to the reasonableness of the settlement; and the stage of the proceedings and the amount of discovery completed.

*Donovan v. Estate of Fitzsimmons*, 778 F.2d at 308. *Accord, Gautreaux v. Pierce*, 690 F.2d at 631; *Armstrong v. Board of School Directors*, 616 F.2d at 314. Accordingly, the court turns to those six factors.

### A. Strength of Plaintiffs' Case

Of these factors, the first—the strength of the plaintiffs' case measured against the recovery provided in the settlement—is the most important. *Armstrong v. Board of School Directors*, 616 F.2d at 314; *General Motors Engine Interchange Litigation*, 594 F.2d at 1132 n. 44. Indeed, language in some cases suggest it is the overriding factor, *Mars Steel v. Continental Illinois Nat'l Bank*, 834 F.2d at 682 ("A settlement is fair to the plaintiffs in a substantive sense ... if it gives them the expected value of their claim if it went to trial, net of the costs of trial"), while language in other cases suggests it encompasses other factors. *See, e.g., Donovan v. Estate of Fitzsimmons*, 778 F.2d at 309 ("an integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation."); *Liebman v. J.W. Petersen Coal & Oil Co.*, 73 F.R.D. 531, 535 (N.D.Ill. 1973) ("the primary criterion for the court in evaluating the fairness and adequacy of a proposal is an informed estimate of the probabilities of both liability and damages.... Only by making such an estimate can the court decide whether the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate

procedures are worth relinquishment of plaintiffs' claims.").

In evaluating this factor, however, the court must take care not to conduct something akin to a trial on the merits. *Mars Steel v. Continental Illinois Nat'l Bank,* 834 F.2d at 684 ("The temptation to convert a settlement hearing into a full trial on the merits must be resisted."); *General Motors Engine Interchange Litigation,* 594 F.2d at 1132 n. 44 ("A fairness hearing is not a trial on the merits"). First, something like a trial is unnecessary: the court is not to make findings of fact, but simply to articulate its reasons for approving or disapproving the settlement. *Gautreaux v. Pierce,* 690 F.2d at 631; *Armstrong v. Board of School Directors,* 616 F.2d at 315. More importantly, to proceed too far into the fact-finding process in evaluating the strength of the plaintiffs' case may deprive the parties of something for which they have bargained: "the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation...." *McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 426 (7th Cir.1977); *accord, Seiden v. Nicholson,* 72 F.R.D. 201, 206 (N.D.Ill.1976). It also has been suggested that parties may avoid settlement altogether for fear that the court might adversely determine the case's merits while reviewing the settlement. *Patterson v. Stovall,* 528 F.2d 108, 112 (7th Cir.1976), *quoting Florida Trailer and Equipment Co. v. Deal,* 284 F.2d 567 (5th Cir.1960).

■ But while a trial on the merits is unnecessary and inappropriate, the court must make an independent, if rough, determination of the strength of the plaintiffs' case measured against the terms of the settlement. *Armstrong v. Board of School Directors,* 616 F.2d at 315; *Malchman v. Davis,* 706 F.2d 426, 433 (2nd Cir. 1983) ("while we do not expect the district judges to convert settlement hearings into mini-trials on the merits, we do expect them to explore the facts sufficiently to make intelligent determinations of adequacy and fairness").

At the fairness hearing, counsel for the class strongly suggested that the strength of the plaintiffs' case was such as to make settlement advisable from the class's perspective. The nature of some the objections to the settlement is such as to support that suggestion. The objectors were deeply hurt by Torrington's treatment of them and their fellow workers. Some seemed to feel Torrington should pay more for purposes of punishment; some seemed to feel Torrington should pay more to compensate the class members for their pain and suffering. Punitive damages and non-economic compensatory damages are not, however, recoverable under either the ADEA or ERISA. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985) (ERISA, non-economic damages); *Petrilli v. Drechsel,* 910 F.2d 1441, 1448–1449 (7th Cir.1990) (ERISA, punitive damages); *Espinueva v. Garrett,* 895 F.2d 1164, 1165 (7th Cir.1990) (ADEA). Accordingly, such damage claims are wholly without strength; they could not succeed with or without trial.

Other objectors seemed to feel that damages are beside the point, that a trial should be had so that the truth may be known. While a trial is certainly a vehicle for seeking the truth, the court has found no case from within or without this circuit that suggests that a class should be denied an otherwise fair settlement simply to establish the defendant's alleged wrongdoing.

A few objectors seemed to believe, however, that the damages were insufficient even as compensatory damages. They neither presented evidence nor requested an opportunity to do so, *see Walsh v. Great Atlantic & Pacific Tea Co., Inc.,* 726 F.2d 956, 965 (3rd Cir.1983), but the objectors have no burden of persuasion on the issue of fairness. While it is pertinent that the objectors have failed to propose a better resolution, *McDonald v. Chicago Milwaukee Corp.,* 565 F.2d at 427, their failure to do so does not relieve the settlement's proponents of their burden. Counsel for some objectors freely conceded that he could not determine whether the settlement was fair

to the class because he had no information on which to evaluate the likelihood of the class's success. Class counsel asked not to be required to submit his assessment of the case's weaknesses for fear of a summary judgment motion by Torrington should the settlement be disapproved.

■ Knowledge of the strength of the plaintiffs' case need not stem solely from the fairness hearing. In *United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir.1971), for example, the court noted

> The soundness of the district court's conclusion of approval or disapproval may also be determined by a consideration of the court's knowledge of the case drawn from pretrial conferences, dispositions of preliminary motions and matters, oral arguments and reading of briefs, transcripts and affidavits, as well as from the evidence adduced at the hearing on the compromise.

Here, however, the sole pre-settlement submission to the court involved a discovery dispute. Apart from the unsupported implied assessment of class counsel and the plainly unavailable damage claims sought by some objectors, the record before the court following the fairness hearing did not permit the court to make a sound assessment of the strength of the plaintiffs' case

on the merits measured against the amount of recovery. Accordingly, the court directed counsel to submit outlines of the evidence upon which they would rely at trial. The parties' submissions are summarized below.

#### 1. Plaintiffs' Proof

The plaintiff class informed the court that should the case go trial, the class would rely on *Metz v. Transit Mix*, 828 F.2d 1202 (7th Cir.1987), for its ADEA claims, and on *Gavalik v. Continental Can*, 812 F.2d 834 (3rd Cir.1987), for its ERISA claims. The plaintiffs report that their evidence would fall into three principle categories: (1) a comparison of the hourly workforces at South Bend and Torrington's two comparable plants; (2) evidence showing Torrington's stated reasons for closing the South Bend plant to have been pretextual; and (3) statements evidencing Torrington's bias against South Bend employees based on age and benefit bias.

Torrington had two plants comparable to the South Bend plant: one in Shiloh, North Carolina; the other in Union, South Carolina known as the "Tyger River plant". The following table reflects various aspects of the composition of the workforces by age:

| | South Bend | Tyger River | Shiloh |
| --- | --- | --- | --- |
| Hourly workforce | 509 | 345 | 108 |
| Percent over Age 40 | 56 | 47 | 22 |
| Percent aged 60 to 65 | 6.0 | 4.3 | 1.8 |
| Percent aged 55 to 60 | 15.0 | 8.1 | 1.8 |
| Mean age | 42.37 | 40.05 | 34.47 |

Pension and insurance plans differed at the three plants; the Carolina plants provided substantially lesser benefits than did South Bend, costing Torrington less than did South Bend. Higher comprehensive coverage for South Bend employees required the payment of higher insurance premiums. The defined benefit pension plan at South Bend provided higher month-

ly benefits at retirement and more retirement options.

The plaintiff class cites to several portions of the discovery materials indicating the Torrington was well aware of the higher age and greater benefit costs at South Bend.

To prove that age and benefits were the true reasons for the plant closing, the

plaintiff class attacks the truth of Torrington's stated reasons. In one communication at the time of closing, Torrington told its employees that the closure was due to excessive unused capacity, the age of the plants and their equipment, and effectiveness of the plants' layouts. The class argues that the decision to close the South Bend plant was made before the economic downturn to which Torrington pointed, and that Torrington was actively examining the possibility of closing the South Bend plant while simultaneously assuring South Bend employees that the plant would remain open. Relying on Kenneth Knauss' expert opinion testimony, the class contends that Torrington's parent company, Ingersoll-Rand appeared to have a master plan to close older unionized plants throughout the country.

The class describes evidence designed to show that low productivity at the South Bend plant was nothing more than an after-the-fact justification. A written handout distributed to South Bend plant employees at the time of the closing made no mention of low productivity or profitability as a factor in the decision. That rationale first emerged, the class claims, in interrogatory answers filed three years after the closure. This shifting explanation, the class maintains, casts doubt on the truth of the reasons stated at the time of closing.

The class notes that Torrington conducted no studies concerning the relative ages of the plants and equipment on profitability, and that South Bend plant equipment was sent to the other plants after the closing. The class also challenges any suggestion that higher taxes and utility costs motivated the closure decision, noting that Torrington conducted no analysis of the relative impact of such factors on the three plants and did not approach local governments or utility companies for tax abatements or negotiated reductions. Indeed, Torrington declined an offer of economic aid from the City of South Bend.

The class also challenges Torrington's reliance on an economic downturn as justifying the need to close the South Bend plant. The plaintiffs argue that even if a plant had to be closed, one of the others could have been shut down, but deposition excerpts indicate that no thought was given to that option. Torrington had begun to transfer work from South Bend to the other plants for several years before the closure.

The class notes various statements of company officials that are offered to prove age-related bias: "youthful organization"; "young blood"; "old age home"; "the mother plant had raised her two babies and now it was time for the mother to die"; "the age of the people"; "the older people"; "Torrington Country Club and Retirement Home"; "Your people at a certain age bracket is going to cost them"; "too many men over 50 working in the plant"; "high seniority"; "how much younger the work force was"; "we had all these old folks there".

The class also would seek support from Torrington documents noting that fringe benefits at the South Bend plant were 118 percent of direct labor costs, but only 29 percent at the Tyger River plant and emphasizing the size of the unfunded pension liability at the South Bend plant. The class also points to deposition excerpts showing that Torrington personnel made statements that indicated the level of benefits at the South Bend plant played a role in the closure decision: "pension costs were already too high for them"; "close the South Bend plant because insurance costs were too high"; "we shouldn't be asking for more because we could cause the downfall of the entire plant"; "Pension costs and wages are too high at this company. We are going to have to do something about it. Preferably move"; "too many men in the higher age benefit and it would cost a bundle for all of their pensions; it would be cheaper to close the plant".

### 2. The Defendant's Proof

Torrington maintains that the closure resulted from the collapse of the market for heavy bearings such as those produced at South Bend, and other non-age-related factors. The plaintiffs, Torrington maintains, would be unable either to establish a

prima facie case or prove that Torrington's stated nondiscriminatory reasons were pretextual.

Torrington's submission sets forth its version of the events leading to the closure decision. The plants at South Bend, Shiloh and Tyger River constituted the domestic facilities of Torrington's heavy bearings division. In the 1970's, and up to 1981, the heavy bearings market experienced increasing sales as the cost of oil rose. The hourly workforce at the South Bend plant reached 700 in 1980. Nonetheless, productivity at the South Bend plant fell approximately 30 percent from 1976 to 1979; compared to Tyger River, the South Bend plant was operating at a productivity level of 70 percent. Torrington believed that abuse of the incentive pay system at South Bend was a substantial factor in the low productivity.

In early 1980, Torrington tried to address these concerns with what it called its "Flagship Program" to improve work habits, accountability, accuracy in work reports, reduce the need for rework, revise the incentive pay system, and revise production standards. The program lasted but a few months, and "Flagship II" was implemented in August, 1980. As part of this program, the manufacture of small bearings was transferred to the newly-completed Shiloh plant, and machinery for that production was moved from South Bend to Shiloh. Manufacture of a larger size of bearings was directed to Tyger River. Manufacture of still larger bearings was to be done at South Bend, and machinery for that production was transferred from Tyger River to South Bend. Despite these reorganizations, Torrington maintains, production at South Bend continued to disappoint, and lower productivity at South Bend led to only marginal productivity.

Torrington tried additional steps. It introduced cell manufacturing, whereby a particular product was to be manufactured in a small area. It also attempted to introduce "quality circles". The local union opposed both these efforts.

In April, 1981, concerned with productivity problems at the South Bend plant, Torrington's president commissioned a Task Force to, in the words used in Torrington's submission, "study the various issues". The Task Force began its work in late 1981 and completed its report in March, 1982. In the meantime, Torrington maintains, the heavy bearings market collapsed, in contravention of predictions of Torrington experts and hopes of Torrington management. As oil prices fell, so, too, did the demand for goods needed for domestic exploration. Projected sales increases had Torrington thinking of building a new plant, but sales in 1982, originally projected at $180 million or more, amounted to only $112 million.

Despite ignorance of the short-term economic future, the Task Force's April, 1982 report recommended implementation of a vigorous cost improvement program for 1982, and deferral until late 1982 of a decision on the future of the South Bend plant. The Task Force report was submitted to Ingersoll–Rand, which decided to keep the South Bend plant open while continuing the effort to improve its performance. Nonetheless, in the second quarter of 1982, Torrington's president directed that a contingency plan be developed for each operating division. The Heavy Bearing Division's plan called for closure of the South Bend plant if sales fell to $130 million, and the closure of the Shiloh plant if sales fell to $100 million. Torrington continued to hope for market improvement, though, and did not close the South Bend plant in 1982 despite sales of only $112 million. Productivity also improved at the South Bend plant in 1982, and Torrington's president told hourly workers in July, 1982 that they had earned the right to have the plant kept open.

When the economic downturn continued through 1982, Torrington began to take steps to cut costs. The South Bend plant was shut down during the Christmas holiday season. The number of salaried employees was reduced from 300 to 240; the hourly workforce fell to 275. In October, Torrington projected 1983 heavy bearings sales of from $87 million to $66 million.

As a result of worsening economic conditions, the division's severe over-capacity, and the pinch of operating losses, Torrington returned to consideration of closing the South Bend plant in May, 1983. Following a discussion of excess capacity and the need to close a manufacturing facility, Ingersoll–Rand authorized Torrington's president to close the South Bend plant. He, in turn, ordered one more, and final, study.

Torrington concluded that the heavy bearings division had a significant excess capacity, and that a plant had to be closed. Tyger River was ruled out, because it was by far the most productive and profitable of the plants, had double the productive capacity of South Bend with only half the square footage, had a more efficient and modern design, and benefitted from lesser costs for utilities, maintenance and taxes. Torrington also deemed it preferable to keep Shiloh open: Shiloh was a brand new facility with state of the art building design and equipment; only a small portion of its $40 million cost had been depreciated; closure of Shiloh would deprive Torrington of benefit of the tax deduction for depreciation; Shiloh was specifically designed to produce a high volume of smaller bearings. In contrast, the South Bend facility was a low-ceilinged, sixty-year old plant with a chaotic, inefficient lay-out. It offered little opportunity for depreciation and business expense deduction.

The decision to close the South Bend plant, according to Torrington, was made in September, 1983. The decision was communicated to the plant's management at the end of September, and announced publicly on October 13, 1983.

Torrington challenges the force of the plaintiffs' proof. The cost of benefits was, Torrington contends, negligibly higher at South Bend than at Shiloh, and were similar to the plants' difference in costs that were not age-related, such as maintenance costs, taxes, utility costs, and indirect labor costs. The largest differential between South Bend and Shiloh, Torrington maintains, was labor costs, not due to employees' age, but due instead to the job performed and wage rates.

Torrington maintains that the difference between the age compositions at South Bend (56 percent over the age of 40) and Tyger River (47 percent over 40) were not sufficiently significant. Shiloh had a newly hired work force, only 22 percent of which was over 40 years of age.

Attempting to turn the tables of pretext, Torrington refers to the local union's arguments concerning the reasons for closing the plant. The local argued to the National Labor Relations Board that Torrington had closed the South Bend plant to avoid a union-represented work force (a point with which the NLRB agreed), then argued that Torrington had closed the plant to avoid liabilities under the Occupational Safety and Health Act.

Torrington also argues that the claims under ERISA must fail because none of the plaintiffs exhausted their administrative remedies. Torrington notes that exhaustion of administrative remedies generally is required for prosecution of an ERISA claim in the Seventh Circuit. *Janowski v. Local 710 Pension Fund*, 673 F.2d 931 (7th Cir. 1982); *Allen v. American Home Foods, Inc.*, 644 F.Supp. 1553 (N.D.Ind.1986).

Torrington also contends that the testimony of the plaintiffs' principal expert witness, Kenneth Knauss, is excludable on several evidentiary grounds, including lack of expertise and bias. Finally, with reference to the statements the plaintiffs proffer as indicative of age-related bias and role that ERISA-protected benefits played in the closure decision, Torrington argues that the statements would not be admissible in evidence; the speakers either had no personal knowledge of the statements related, or were made by Torrington managers who spoke outside the area of their authority or who had no role in the closure decision.

### 3. Conclusion

The foregoing recitations vigorously summarize the parties' submissions, which amount to nearly 100 pages in their original form. Even as so summarized, however, the submissions indicate that the plaintiffs' case has strength sufficient to

warrant trial but insufficient to predict success. The plaintiffs would face significant hurdles in overcoming the exhaustion argument directed at their ERISA claims, and in proving that salary costs were related to the age of the workforce rather than to wage structure. Their success in proving their case might depend on the admissibility of Mr. Knausss' expert testimony and certainly would depend on the admissibility of statements purportedly disclosing age bias and benefit motivation.

The defendant, in turn, would face the challenge of explaining (as their submission did not) why, if the economic environment triggered the plant closing, closure was discussed even as its experts offered rosy economic projections. If Torrington were unsuccessful in excluding the "bias" statements from evidence, they would face an enormous challenge in explaining them: while the statements concerning benefits may be explicable as related to labor negotiations, Torrington's written submission offered no explanation of the age-related comments. Further, Torrington would face evidentiary hurdles of its own, particularly in seeking to introduce the local union's allegations in a suit in which the local union is not a party.

■ In sum, the strength of the case is such that the settlement cannot be described as unfair either to the plaintiff class or to Torrington. Were the case tried, either might win, and either might lose. Settlement is a prudent course in such cases.

### B. Complexity, Length and Expense

In one sense, this is a simple case: it deals with a single decision by Torrington. Unlike some class-wide employment discrimination claims, the plaintiffs need not focus on innumerable allegedly discriminatory decisions demonstrating a pattern or practice. The plaintiffs may focus solely on the decision to close the South Bend plant.

To focus on that decision, however, the plaintiffs would have to overcome a Torrington contention that the decision to close the plant was based on non-discriminatory

economic factors. The parties' submissions, discussed and summarized above, demonstrate that the plaintiffs would not have the privilege of attacking a single economic consideration as a pretext for discrimination. As a practical matter, therefore, despite the seductive apparent simplicity of a class action based on a single decision by an employer, proof of discriminatory motive would be a complex matter.

Proof of damages would be even more complex. More than two hundred separate damages claims might have to be presented to a jury.

■ Length of litigation already is a factor. The case, now in its sixth year, is already among the oldest cases on this docket. Trial necessarily would be lengthy and expensive, and the appeal process likely would delay any award beyond trial. Even assuming recovery by the class, economic principles dictate that a dollar received in settlement today is worth more than a dollar awarded several years from today. *See Donovan v. Estate of Fitzsimmons*, 778 F.2d at 309.

### C. Degree of Opposition to Settlement

The degree of opposition to the settlement is difficult to determine. As noted above, the class consists of 352 persons, none of whom opted out of the class. Twenty-six persons filed objections, a modest number in light of the size of the class, but the inclusion of the petition may be viewed as enlarging the objecting group to as many as 118, which would constitute one-third of the class.

■ The extent of opposition rarely is a factor entitled to great weight in determining the fairness of a proposed settlement. In *Armstrong v. Board of School Directors*, 616 F.2d at 326, the court cautioned that this factor is "not dispositive even when many class members object", and also warned that the district court should be hesitant to infer fairness from the absence of many objections. *Cf. Mars Steel Corp. v. Continental Illinois Bank*, 834 F.2d at 680. Settlements have been approved in face of objection by even larg-

er portions of the class. See, e.g., *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983) (more than 600 objectors in class of 1,469; 23 of 27 named plaintiffs objected); *League of Martin v. Milwaukee*, 588 F.Supp. 1004 (E.D.Wis.1984) (108 objectors in class of 200).

Without deprecating the objectors' sincerity, the degree of opposition to this proposed settlement is a neutral factor. The number of objectors and petition signatories appears neither remarkably high nor remarkably low. Further, closer review of the objections shows that the objectors focus on different aspects of the proposed settlement. In effecting a settlement, "each party expects to make some surrender". *United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 656 (7th Cir.1971). The "inherent nature of a compromise is to give up certain rights or benefits in return for others." *McDonald v. Chicago Milwaukee Corp.*, 565 F.2d at 429. That a class this size would have internal disagreement as to which rights or benefits to surrender is not surprising.

Further, some of the class raise objections commonly seen in class litigation. The relief to be awarded under the proposed settlement varies depending on the class member's seniority, age and the nature of his or her claim; some objectors challenge the methods of achieving this differential relief. Such objections are not uncommon. See *League of Martin v. Milwaukee*, 588 F.Supp. at 1024 ("Allocation of relief among class members is a difficult task. Yet it is not uncommon for class members with prior charges of discrimination to receive special relief in settlement."). Recognizing that the court cannot accept a proposed class settlement with modifications, the court cannot say that the allocation of benefits contemplated by the proposed settlement is unreasonable or unfair.

Some challenge is made to the proposed attorney fees. While the court has an obligation to assure that those fees are reasonable, *Liebman v. J.W. Petersen Coal & Oil Co.*, 73 F.R.D. 531, 537 (N.D.Ill.1973), "it is not uncommon for settlement agreements to make provisions for attorney's fees." *McDonald v. Chicago Milwaukee Corp.*, 565 F.2d at 423. The fee award contemplated by this settlement agreement is reasonable in light of the scope and duration of discovery and the complexity of the governing law.

Finally, several objectors attack the extent and nature of their contact with class counsel, contending that contact should have been more frequent or should have been conducted through the local union. In *League of Martin v. Milwaukee*, 588 F.Supp. at 1023, the court wrote,

> counsel for the class was not required to, and could not in fact, remain in constant communication with the class. A measure of confidentiality in negotiations is a necessary attribute of a successful settlement effort. To impose a requirement that meetings of the class be held on a weekly basis for the purposes of discussing the posture of negotiations and gathering commentary from dissenting class members would have delayed the negotiations, but more importantly, dissemination of the parties' respective positions in negotiation proceedings puts a strain on the parties' ability to reach an accord.

Recognizing the contact between counsel and class member simply cannot be as frequent or extensive as class members would like (or for that matter, as frequent or extensive as counsel would wish under ideal circumstances), the court does not believe that the objections based on the extent and manner of contact between counsel and class are well-taken.

With these considerations in mind, the court believes that the degree of opposition to the settlement, a factor rarely entitled to great weight in any event, slightly favors a finding of fairness.

### D. The Presence of Collusion in Gaining a Settlement

No objector has suggested collusion between Torrington and class representatives in gaining this settlement. A few suggested that class counsel and class representatives were unduly influenced by the national union, which is not a party to this litiga-

tion. The court believes that this suggestion is addressed more conveniently in conjunction with the next factor.

### E. The Opinion of Competent Counsel

 It was noted earlier that the most important of the factors to be considered in evaluating the fairness of a proposed settlement is the strength of the plaintiff's case measured against the settlement's terms. Reported cases suggest that the opinion of counsel is the next most influential factor. In considering a proposed settlement, a district court may rely heavily on the opinion of competent counsel. *Gautreaux v. Pierce*, 690 F.2d at 631; *Wattleton v. Ladish Co.*, 89 F.R.D. 677, 682 (E.D.Wis.1981) ("In evaluating the strength of the plaintiffs' case on the merits, the Court places much weight on the statements of both plaintiffs' counsel ..."); *Liebman v. J.W. Petersen Coal & Oil Co.*, 73 F.R.D. 531 (counsel for plaintiffs in four of six consolidated actions objected). The court's observations in *Armstrong v. Board of School Directors*, 616 F.2d at 325, are applicable here:

> While the court, of course, should not abdicate its responsibility to review a class action settlement merely because counsel support it, the court is entitled to rely heavily on the opinion of competent counsel.... Counsel for the plaintiff class and counsel for the defendants had been extensively involved in the litigation through virtually all of its history, giving the court ample time to evaluate their competence and the weight to be accorded their opinions.... [S]ettlement of this litigation was reached at a very late stage, after the issues had been clearly identified, liability and impact had been decided, and a massive record had been compiled. The district court found, and we agree, that the litigation had progressed to a point at which counsel and the court were fully capable of evaluating the merits of plaintiffs' case and the probable course of future litigation.

The class and Torrington each are represented by highly respected attorneys and law firms. The competency of counsel is not in doubt. Although some objectors claim the class attorneys did a poor job, those opinions appear to be based principally on the perceived adequacy of the settlement. Counsel for the class and the defendant opine that the settlement is a fair, adequate and reasonable one.

The court's inquiry cannot end there, however. The court also must consider whether the class members were represented properly by their counsel and representatives. *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1169 (7th Cir. 1980), *rev'd in part on other grounds*, 455 U.S. 385 (1982); *In re General Motors Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). In this context, several objectors have asserted that the litigation was controlled, not by the class representatives, but rather by the international union. They assert that the international union presented them with this settlement on a "take it or leave it" basis. The court requested the plaintiffs to address these concerns in their post-hearing submission. They did so, and their response satisfies the court.

The class reports that all members were offered the opportunity to object to the settlement's terms. The class concedes that the settlement contains a provision that would allow Torrington to withdraw if ten percent of the class members opt out; Torrington insisted upon this clause, the plaintiffs explain, to avoid the risk of a second suit brought by a significant number of former class members.

The class also concedes that the international union has assisted in funding this suit, but would not fund other litigation brought by class members who opt out. Accordingly, class members were informed that should they opt out, they would bear the costs of further litigation. The plaintiffs further report that it is unknown whether the international union would continue to fund the suit should the court reject the settlement, because the international union has not been asked its position on that issue.

Nothing in the record leads the court to suspect that either the plaintiff class or the international union has colluded with Torrington in such a way as to undercut class members, or that the international union has exercised undue influence over the class or its counsel, or that the opinion of class counsel is based on any improper factor. Accordingly, the opinions of counsel for the class and for Torrington weigh heavily in favor of approval of the settlement.

### F. Stage of Proceedings; Amount of Discovery Completed

This litigation has been pending for more than five years. The deadline for completion of discovery has passed, and counsel report that thousands of documents have been produced, interrogatories have been exchanged, and depositions have been taken without number. Little more remains to be learned about the strengths and weaknesses of the parties' cases.

### III.

 The court recognizes the objectors' sincerity. The closing of Torrington's South Bend plant brought considerable pain and economic loss to its workforce. Nonetheless, each of the foregoing factors favor the settlement's approval. There is no evidence of collusion. Trial and appeal would be lengthy and expensive, delaying (if not defeating) any recovery by the class members. Exhaustive discovery has disclosed the case to counsel, whose competent opinions jointly endorse this settlement. The court has insisted on proffers from each side, and those proffers disclose a case that the plaintiffs could lose as easily as they could win. The nature and number of objections are not of the sort as to disfavor the settlement.

Accordingly, the court APPROVES the tendered settlement. Counsel shall submit an appropriate form of order entering the settlement as a final judgment.

SO ORDERED.